OPINION
{¶ 1} Appellant, K.P., appeals from the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, adjudicating N.P. and *Page 2 
G.P. abused, neglected, and dependent children.[1] Pursuant to those findings, temporary custody of the children was awarded to their mother, L.W.[2]
 {¶ 2} On January 5, 2007, Franklin County Children Services ("FCCS") filed a complaint alleging that N.P. and G.P were abused, neglected, and dependent children pursuant to R.C. 2151.031(D), 2151.03(A)(2), and2151.04(C), based on four referrals received by FCCS in the preceding ten months. Those referrals concerned allegations of physical abuse and the amount of "control" that K.P., the children's father, exerted over them.
 {¶ 3} The matter was referred to a magistrate, who conducted an adjudication hearing over the course of five days. In a thorough and thoughtful decision issued on March 29, 2007, the magistrate found N.P. and G.P. to be abused, neglected, and dependent minor children. K.P. filed objections to the magistrate's decision, which the trial court overruled. K.P. filed a timely notice of appeal, asserting the following assignment of error:
 THE MAGISTRATE FAILED TO CONSIDER THE TESTIMONY OF THE FATHER'S WITNESSES AS INDICATED IN HIS FINDINGS OF FACT AND CONCLUSIONS OF LAW. THIS PRESUMPTION IS BASED UPON THE MAGISTRATE'S DECISION WHICH FAILS TO SPECIFICALLY MENTION ANY OF THE TESTIMONY WHICH WAS PROVIDED BY THE WITNESSES OF THE FATHER. *Page 3 
 {¶ 4} The starting point for our analysis is the magistrate's decision. Therein, the magistrate explained:
 The evidence very clearly showed that each child suffered physical harm when their father, [K.P.], grabbed their hair in such a manner that their hair came out of their scalps. [K.P.] admits to grabbing the girls' hair at times as a form of behavior modification. [N.P.] testified very credibly about her father pulling her hair out, as well as her younger sister [G.P.'s] hair. Numerous witnesses spoke of seeing bald areas on the heads of [G.P.] and [N.P.], where the hair had been pulled out. There is no question that [K.P.] pulled hair out of the scalps of his two daughters. ORC 2151.031(D) has been met by the State, with the injury having caused harm to the health of each child.
 The evidence at trial proved by clear and convincing evidence that these children are neglected minors as well. Specifically, the neglect involves the children being habitually poorly clothed, unclean, habitually not provided food while at school, and habitually having school matters and homework go untended to at home.
 * * *
 [K.P.'s] inattentiveness to the children's readiness, both physically and academically, at school was shown to be of such a degree as to constitute habitually not providing adequate parental care because of his own faults and habits.
 School officials have found food to be a major issue with [G.P.] and [N.P.]. For more than one school year, [N.P.] has been frequently fed lunch by school personnel via an informally arranged "snack box" kept in the office exclusively for [N.P.]. This "snack box" has been supplied by school employees and by [L.W.], mother of [N.P.] (and [G.P.]). The logistics of this emergency food stash for [N.P.] have been arranged without [K.P.'s] involvement, as he has very clearly indicated his opposition to others bailing out [N.P.] when she fails to properly prepare herself with getting food for lunch to school properly.
 [K.P.] has strictly forbidden the children from ever buying lunch at school. He also is completely uninvolved in the process of seeing that [N.P.] packs her lunch at all, no involvement in what she packs, and he does not see to it that the child *Page 4 
remembers to bring it to school. [K.P.] has refused to allow anyone to establish an account with the school, which can be accessed when [N.P.] is without a lunch, which is a frequent occurrence.
 * * *
 The evidence did show that each of these children has gained a significant amount of weight in the period of time following their removal from their father's care in November of 2006. This is a circumstance that supports the claim that [K.P.] has failed to properly feed the children, and has kept their weight at artificially low levels as a result.
 Independent of the abuse and neglect evidence already referenced, there are additional facts shown by clear and convincing evidence to establish dependency of [N.P.] and [G.P.].
 * * *
 Once school is over for the day, the girls go to a sitter, the same sitter who feeds the children and gets them to school in the morning after [K.P.] drops them off at 7:30 a.m. While at the sitter's house, homework is not allowed to be done, per [K.P.'s] orders if the child is grounded. This seemingly senseless rule is an indication of the lack of priority placed upon schoolwork by [K.P.], as groundings are in effect a majority of the time for [N.P.].
 * * *
 Groundings and time outs are given on a nearly constant basis to [N.P.]. * * *
 Homework is only able to be done if everything else is finished for the children. In other words, schoolwork at home is an after-thought compared to house chores and punishments. [K.P.] speaks of `allowing' his children to do homework, but absolutely no evidence exists of him properly being involved in facilitating homework, helping with it, or seeing that it gets done and properly returned to school. Since chores are often not completed before bedtime, homework often never is even begun. *Page 5 
 Part of the dependency is based on the fact that these children have inadequate parental interactions with their father. They can only speak with him in their allotted time slot. He is uninvolved in their schoolwork. Not one mention was made of time together doing anything special together; no books, no games, no loving interaction was hinted at by the evidence. This is an environment which needs intervention.
 Punishment was in effect three or more days per week for N.P., according to evidence and testimony. During these all-to-frequent occasions, life was even worse for these children.
 * * *
 Parenting styles differ greatly, and are generally within the wide boundaries of parental discretion, which should be respected by authorities such as this Court. This case involves disciplinary methods and rules which go so far beyond reasonable as to be best described as humiliating. Forcing a 4th
grader to wet her bed rather than use the bathroom at night is unjustifiable. Forcing [N.P.] to go without lunch at school is unhealthy and certainly not conducive to learning. Having [N.P.] fed by school personnel continually is a constant source of shame and humiliation to the child. When methods such as these are joined with the pulling out of hair and the lack of attention to clothing, food and hygiene, it creates a situation where young children can barely be expected to function properly in the public setting of a school. That [K.P.] only purchased clothes for them when they are good only accentuates the fact that he sees the basics of life as having to be earned by his children. The withholding of food from the children is illustrative of the same approach.
 [K.P.] made a point of noting to the schoolteacher that [N.P.] was constantly in trouble and on punishment at home. This was not done to try to further [N.P.'s] education, but rather as a means to try to convince the school that [N.P.'s] failings were her fault, not his. This kind of adversarial rivalry between child and parent is not in furtherance of the child's best interests.
(Magistrate's Report and Recommendation, at 1-5.)
 {¶ 5} The objections filed by K.P. primarily took issue with the magistrate's assessment of witness testimony. Specifically, K.P. argued that the magistrate failed to *Page 6 
consider witness testimony that was favorable to him. As previously noted, the trial court overruled K.P.'s objections. In its decision, the trial court summarized the testimony of each witness that K.P. claimed the magistrate had not considered, specifically noting that which could be construed as "favorable" testimony. After discussing its evaluation of same, the trial court rejected K.P.'s argument that testimony had not been considered, and further explained why the testimony that K.P. claimed to be favorable was, in fact, neutral at best. Based on the record before it, the trial court concluded that there was clear and convincing evidence to support the magistrate's findings of abuse, neglect, and dependency, and, therefore, the court approved and adopted the magistrate's decision.
 {¶ 6} On appeal, K.P. essentially reasserts the same arguments, maintaining that the magistrate failed to consider witness testimony favorable to him, and that the trial court attributed certain testimony to the wrong witnesses and picked out only negative aspects of other testimony. Although K.P. asserts that these alleged errors compel reversal, he does not offer any explanation as to how the same constituted an abuse of discretion or resulted in prejudice, nor does he challenge the trial court's determinations as being against the manifest weight of the evidence. In other words, K.P. has not demonstrated any nexus between the alleged errors and a basis for reversal. Even if we were to assume that KP. is correct, and the trial court erred as alleged, the record still contains clear and convincing evidence to support the court's determinations that N.P. and G.P. were abused, neglected, and dependent children.
 {¶ 7} That a child is an abused, neglected, or dependent minor must be established by clear and convincing evidence. R.C. 2151.35(A). Clear and convincing evidence is that measure or degree of proof which is more than a mere preponderance of *Page 7 
the evidence, but does not reach the extent of the certainty required to establish "beyond a reasonable doubt" in criminal cases. It is that quantum of evidence which will produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established.Cross v. Ledford (1954), 161 Ohio St. 469. When reviewing a trial court's decision on a manifest weight of the evidence basis, we are guided by the presumption that the findings of the trial court were correct. In re Williams, Franklin App. No. 01AP-867, 2002-Ohio-2902. The weight to be given the evidence and the credibility of the witnesses are primarily for the trier of fact. State v. DeHass (1967),10 Ohio St.2d 230, paragraph one of the syllabus. The rationale for this presumption is that the trial court is in the best position to evaluate the evidence by viewing witnesses and observing their demeanor, voice inflections, and gestures. Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77. Thus, judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence.C.E. Morris Co. v. Foley Const. Co. (1978), 54 Ohio St.2d 279, paragraph one of the syllabus.
 {¶ 8} In the present case, the trial court found there existed clear and convincing evidence that N.P. and G.P. were abused, neglected, and dependent children pursuant to R.C. 2151.031(D),[3]2151.03(A)(2),[4] and 2151.04(C).[5] After careful review of the record evidence, we agree with the trial court's determinations. *Page 8 
 {¶ 9} To begin, evidence was adduced at the hearing regarding K.P.'s methods of discipline, which went to one of the core issues in the case. K.P. admitted that he would pull the children's hair as a means of getting them "to listen" to him and "cooperate with the rules." (Tr. Jan. 29, 2007, at 19, 20.) And, although K.P. denied having pulled the children's hair out of their heads, reasonable inferences drawn from the cumulative value of witness testimony were sufficient for the magistrate to conclude that K.P.'s hair pulling caused the patches of thin or missing hair in both children. (Tr. Feb. 9, 2007, at 69, 70, 104-106, 128, 129; Tr. Jan. 29, 2007, at 86, 87, 91-92, 96, 101.)
 {¶ 10} K.P. also admitted to disciplining N.P., on at least one occasion, with "a little wooden bat." (Tr. Jan. 29, 2007, at 40.) Regarding that incident, N.P. testified that she had been punished and sent to bed, and was not permitted to leave her room until morning. Unable to hold her bladder, N.P. wet her bed, which is when K.P. "got the baseball bat." (Tr. Feb. 9, 2007, at 68, 71.)
 {¶ 11} The children were also grounded on a routine basis, especially N.P. Reasons for being grounded included, but were not limited to: being late in the morning, being late to the dinner table, not completing chores, getting more than six time outs in one day, or eating the lunch their mother brought to school for them. When grounded, the children would have to take a nap after school at their babysitters, would not be permitted to have an after-school snack, and would lose television privileges. At home, being grounded included being sent to sit on their beds and look down at the floor. For N.P., being grounded also included having to write a four-page essay, front and back, about what she did wrong. And, once grounded at home, restrictions could extend to *Page 9 
when N.P. was at school. N.P. testified about one occasion in which K.P. instructed her to sit on the bench during recess, and forbade her to engage in play during that time.
 {¶ 12} Timeouts were another disciplinary measure employed by K.P. A timeout for N.P. consisted of repetitively saying a phrase, such as "start to listen," for several minutes on end. (Tr. Feb. 9, 2007, at 63.) According to N.P., when a timeout was over, she would have to request permission to speak to her father, and, if he granted her permission, she would then apologize to him and explain how she would do things differently the next time. If K.P. did not grant her permission, then she would have to write a "sorry note," detailing what she did wrong and how she would behave differently in the future. Id. at 64.
 {¶ 13} In addition to K.P.'s methods of discipline, the magistrate also found K.P.'s adherence to and insistence on an unreasonable morning schedule adversely affected the children's daily functioning. The children's morning schedule was 25 minutes, from start to finish. K.P. would wake the children up at 7 a.m. and they would be expected to be ready to leave the house by 7:25 a.m.; any chores not completed from the previous night were also expected to be tackled during these same 25 minutes. The children were responsible for remembering to take their book bags, which contained their lunches and homework assignments, along with them when they left in the morning. K.P. provided no oversight to ensure the children had what they needed for school.
 {¶ 14} The morning rush contributed to the children's failure to be prepared for school. N.P. testified that she would be grounded if she was not ready to leave on time, and, in her rush to be on time, she would often forget her book bag, and in it, her lunch. K.P. testified that time constraints would not permit him to let N.P. go back inside to *Page 10 
retrieve her book bag (and lunch), and, he would "sometimes" be aware that N.P. would be going to school without lunch as a result, though he took no apparent measures to see that did not happen. (Tr. Jan. 29, 2007, at 52.) L.W. testified that she had put money in an account at school for N.P. so that she could buy lunch, but the school refunded L.W. her money because K.P. did not want N.P. to be able to purchase lunch. N.P. testified that she went to bed without dinner approximately three to four days a week, and she had observed occasions when G.P. went to bed without dinner as well. At the time L.W. was awarded temporary custody, G.P. and N.P. were ages six and eleven, respectively, and both wore a girls' size six. Within three months of living with L.W., N.P. had gained approximately 23 pounds.
 {¶ 15} There was also testimony that disclosed proper clothing was also an issue. N.P. testified that K.P. would make her earn clothes by behaving properly. Concerned, L.W. brought clothes and shoes to N.P.'s school so that she would have proper seasonal attire.
 {¶ 16} Several of the children's teachers testified at the hearing regarding their appearance, as well as issues relating to their apparent lack of food and academics. One such teacher was Heather Gray ("Gray"), G.P.'s kindergarten teacher. Gray testified that G.P. would "appear dirty or like she hadn't taken a bath" and that her hair would "smell." (Tr. Feb. 9, 2007, at 7, 8.) She also described G.P.'s clothes as being either too big or too small, and frequently worn inside out and/or backwards. G.P. also complained to Gray that she was hungry, and Gray observed that G.P. "would constantly want food at school." Id. at 7. In fact, when G.P. would be rewarded for good behavior in connection with Gray's classroom reward system, G.P. would always choose a snack over the toy *Page 11 
prizes. Gray also testified that "many times," G.P. did not attend school equipped with her book bag or she was otherwise unprepared. Id. at 11.
 {¶ 17} Melissa McCoy ("McCoy"), N.P.'s third grade teacher, testified that N.P. would frequently forget her lunch, and had, on some of those occasions, emotionally overreacted as a result. (Tr. Feb. 12, 2007, at 17.) McCoy started a "snack bin" for N.P., whereby N.P. could retrieve a snack from the bin when she was hungry. Id. at 21. The impetus for implementing the snack bin was an incident observed by McCoy, which involved another student sharing her lunch with N.P. because N.P. did not have lunch and was hungry. McCoy testified that she did not speak to K.P. regarding N.P.'s lunch situation because when McCoy broached the issue with N.P., N.P. got "very upset and emotional," and pleaded with her not to contact K.P. Id. at 48.
 {¶ 18} In addition to forgetting her lunch, McCoy testified that N.P. would rarely have her daily planner[6] with her in class. When McCoy spoke with K.P. about N.P.'s routine failure to bring her daily planner, K.P. explained that he was a "numbers person and that things were very scheduled" in the home, and, thus, if N.P. missed her allotted time to speak with him and show him her assignments and daily planner, "then he wouldn't sign them and he wouldn't take care of them." Id. at 38. An incident that further alarmed McCoy involved a class assignment in which students were to choose a subject and write a personal narrative essay on the matter. N.P. wrote about a time when she was punished with a spanking and sent to bed early for failing to fill the household "soap dispensers up to the correct line." Id. at 25. McCoy also testified about N.P.'s appearance, remarking how N.P. wore the same pink sweater throughout the school *Page 12 
year, regardless of weather, and described N.P.'s clothes as ill fitting (either too short or too long). With respect to N.P.'s intelligence, McCoy described her as "very intelligent and very responsible," as well as an "extremely successful student." Id. at 10, 14.
 {¶ 19} Dawn Marie Hatton ("Hatton"), N.P.'s fifth grade teacher, also testified at the hearing. Similar to the daily planner that N.P. had when she was in McCoy's class, Hatton required her students to bring their "agenda" with them to class each day, signed by their parent(s). N.P. was no more successful with bringing her agenda to class than she had been with her daily planner. When Hatton asked N.P. why she did not bring her agenda or other assignments to class, N.P. explained to Hatton that "she had chores and she didn't have time to finish [her assignments] and that she had to leave them at home since she didn't get them finished." (Tr. Feb. 20, 2007, at 75.) N.P.'s agenda was introduced into evidence at the hearing, and, in addition to signing it, K.P. would also indicate when N.P. was grounded and the reason why. And, as noted by the magistrate, K.P.'s notations about when N.P. was grounded caused her embarrassment. Since N.P. has been living with L.W., N.P. has consistently brought her agenda with her into class. And, like McCoy, Hatton described N.P. as "a fabulous student" and "well behaved in class." Id. at 80.
 {¶ 20} One of the witnesses K.P. argues that the magistrate (and trial court) disregarded was Larry Lee Wickliffe ("Wickliffe"), K.P.'s pastor. Wickliffe testified that N.P. and G.P. were "very well behaved." (Tr. Feb. 20, 2007, at 109.) He also described the children as being "the ideal weight and height for their age[s]," and not malnourished. *Page 13 
Id. at 104-105. With respect to his own children, as well as foster children, Wickliffe testified that he had used the denial of meals as a form of discipline.
 {¶ 21} In addition to Wickliffe, K.P. claims that there was little or no consideration given to the testimony provided by Anthony Kurt Pullman, G.P.'s principal in the first grade, and Aiden Flanagan, an FCCS caseworker assigned to the family.[7] We have reviewed the testimony of these witnesses, and find that they add nothing of consequence to the case, and certainly do not contradict or undermine the testimonies of all the other witnesses.
 {¶ 22} The weight to be given the evidence and the credibility of the witnesses are primarily for the trier of fact. Seasons Coal Co., supra. Based upon our review of the record in this case, we find that the magistrate's decision is a reasonable interpretation of the evidence, and the trial court properly ruled on K.P.'s objections. As such, we find the trial court's determinations that G.P. and N.P. were abused, neglected, and dependent children were supported by clear and convincing evidence. Accordingly, we overrule K.P.'s single assignment of error.
 {¶ 23} For the foregoing reasons, K.P.'s single assignment of error is overruled, and the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch is hereby affirmed.
Judgment affirmed.
BRYANT and TYACK, JJ., concur.
[1] For the purpose of anonymity, both first and last names of the minor children and parents are designated throughout this opinion by initials only. N.P. and G.P. are collectively referred to as the "children."
[2] K.P. and L.W. were divorced prior to the filing of FCCS's complaint. Aside from the fact that the children lived with K.P. and had visitation with L.W., the precise child-custody arrangement that the parties had in place is not clear from the record before us.
[3] Pursuant to R.C. 2151.031(D), an abused child includes any child who "[b]ecause of the acts of his parents, guardian, or custodian, suffers physical or mental injury that harms or threatens to harm the child's health or welfare."
[4] Pursuant to R.C. 2151.03(A)(2), a neglected child is one "[w]ho lacks adequate parental care because of the faults or habits of the child's parents, guardian, or custodian."
[5] Pursuant to R.C. 2105.04(C), a dependent child is one "[w]hose condition or environment is such as to warrant the state, in the interests of the child, in assuming the child's guardianship."
[6] The purpose of the daily calendar was twofold: first, enable students to keep track of their homework assignments; and, second, communicate to parents what their children were working on at school, as daily parental signature was required.
[7] K.P. also took issue with the trial court's treatment of Hatton's testimony, which we have thoroughly discussed in this opinion. *Page 1