[Cite as *In re E.M.*, 2014-Ohio-1026.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

|  |  |  |
|---|---|---|
| | : | |
| In re E.M. | | |
| | : | |
| [M.R. | : | **No. 13AP-284**<br>(C.P.C. No. 12JU04-5124) |
| Appellant]. | : | **(REGULAR CALENDAR)** |
| | : | |

---

D E C I S I O N

**Rendered on March 18, 2014**

---

*Yeura R. Venters*, **Public Defender, and** *John W. Keeling*, **for appellant.**

*Ron O'Brien*, **Prosecuting Attorney, and** *Katherine J. Press*, **for State of Ohio.**

---

**APPEAL from the Franklin County Court of Common Pleas,
Division of Domestic Relations, Juvenile Branch**

O'GRADY, J.

{¶ 1} Defendant-appellant, M.R., the mother of minor child E.M., appeals from a judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, finding E.M. to be an abused, neglected, and dependent child. For the following reasons, we affirm.

## I. BACKGROUND

{¶ 2} On April 11, 2012, Meghann Round, a caseworker with the Permanent Family Solutions Network, an affiliate of Franklin County Children Services ("FCCS"), filed a complaint alleging that E.M., born November 22, 2009, was an abused, neglected, and dependent child. Four causes of action were set forth pursuant to R.C. 2151.031(C)

and (D), 2151.03(A)(2), and 2151.04(C). According to the complaint, on or about July 21, 2011, FCCS received a referral regarding the well-being of E.M. E.M.'s parents, appellant and G.M. ("father"), were separated and functioning under an informal parenting-time agreement. E.M. was in the care of appellant from July 15 to July 20, 2011. When E.M. was returned to her father, he observed bruising on E.M.'s face and body, which prompted him to take E.M. to the hospital.

{¶ 3} According to the complaint, bruising was observed over substantial portions of E.M.'s face, including around her eyes, on her ears, lower lip, cheeks, chin, and on her neck. She had petechiae under both eyes and on her eyelids. She had bruising on her back and torso, as well as faded bruising on her abdomen and anterior chest wall. She also had a perforated ear drum, which caused blood in her ear canal. Appellant's explanation for the injuries was that she strapped E.M. into her car seat, but appellant was unaware that the car seat was not secured to the seat itself. While driving, appellant slammed on her brakes which caused E.M. to be propelled forward hitting the center rear console, face down, with her car seat on top of her. Appellant did not seek medical care for E.M.

{¶ 4} The complaint noted concerns that E.M.'s injuries were not consistent with appellant's explanation. During a child abuse consult, it was discovered that E.M. had a healing left distal radius fracture that was about two weeks old, as well as a healed right clavicle fracture that was approximately two months old. During a subsequent trip to the hospital, medical personnel discovered that E.M. had a left distal ulna fracture, one fracture to her right hand, and two fractures in her right foot. The hospital reported to FCCS that these fractures appeared to have occurred at the same time as the previously discovered injuries. The complaint also noted that appellant's paramour had a criminal history including, among other offenses, a domestic violence case involving his stepson as the victim. The complainant requested that the trial court grant custody of E.M. to father with court ordered protective supervision by FCCS.

{¶ 5} On June 4, 2012, a magistrate conducted a hearing regarding the allegations in the complaint. In attendance were appellant with counsel, father with counsel, counsel for the state of Ohio, Meghann Round, William Hayden, who was E.M.'s guardian ad litem, and Gail Hornor, a pediatric nurse practitioner. Father testified that appellant had

E.M. for a five-day period in July 2011. When he relinquished E.M. to appellant, E.M. did not have any injuries. While appellant had E.M., she called father to ask if she could keep E.M. an additional day beyond what they had previously planned and father agreed. Appellant returned E.M. to father on July 21, 2011. Father testified that when appellant took E.M. out of the car on that day, E.M. looked sad and he observed extensive bruising on her face. The sight of E.M. caused him to cry. According to father, appellant explained that she was driving with E.M. three or four days prior. E.M. was in her car seat but the car seat was not secured to the seat itself. Appellant was driving across an intersection when someone ran a red light, which caused her to slam on her brakes. That caused E.M., while still in the car seat, to be propelled forward and hit the back of the seat in front of her. Father testified that he asked appellant if she took E.M. to the emergency room, and appellant told him she did not because she was afraid of "them" taking E.M. (Tr. 77.)

{¶ 6} Father took E.M. directly to Mt. Carmel East Hospital where he observed additional bruises on her body. E.M. was evaluated at Mt. Carmel and released to father with instructions to take her to the Child Assessment Center ("CAC"), affiliated with Nationwide Children's Hospital, the next day for further testing. Staff at Mt. Carmel also referred the matter to FCCS. Father testified that he was aware of the referral and he supported it because he knew he did not do anything wrong and he wanted to find out what happened to E.M. Father brought E.M. to CAC the next day, where she was evaluated by Gail Hornor. Father testified there were a lot of tests run on E.M. at CAC, and they asked him to bring E.M. back in a couple of weeks to check for broken bones that might not be visible in x-rays yet.

{¶ 7} Gail Hornor testified that she examined E.M. at CAC on July 22, 2011. Ms. Hornor had been a pediatric nurse practitioner for 17 years, and a registered nurse for 32 years. One of her primary duties was to perform physical examinations of children when there were concerns about abuse. Ms. Horner testified that E.M. was referred to CAC by FCCS due to concerns about abuse, and she examined E.M. from head to toe. She photographed E.M.'s injuries, ordered blood tests to rule out an underlying cause of the bruising, ordered a full body x-ray to check for broken bones, and facilitated an examination by an ophthalmologist due to the injuries around E.M.'s eyes. Ms. Hornor was aware that Mt. Carmel performed a CT scan of E.M.'s head the day before and that

test was negative. She emphasized that the head CT scan was crucial to rule out intracranial bleeding, and it should have been done when the injuries occurred, not a few days later.

{¶ 8} Ms. Horner described E.M.'s outward appearance for the court. E.M. presented with extensive bruising on her scalp, forehead, ears, cheeks, around her eyes, on her lower lip, chin, neck, shoulder, back, abdomen, and pubic area. She had petechiae around her eyes, on her eyelids, and on one ear. There was a patch of hair on her head that was new growth, and she had a ruptured eardrum with blood in her ear canal. Ms. Horner took several pictures of E.M.'s bruising, which were reviewed with her on the stand and later admitted into evidence.

{¶ 9} Ms. Hornor also testified regarding E.M.'s x-rays. The x-rays were read by a pediatric radiologist and Ms. Hornor reviewed and discussed them with the radiologist. The x-rays revealed two old fractures that did not occur at the same time as the bruising. Ms. Hornor relied on the radiologist to determine the age of the fractures. One fracture to E.M.'s collarbone was approximately two months old. Another fracture to the distal radius was approximately two weeks old. Ms. Hornor noted that new fractures do not always show up in x-rays until they begin to heal; therefore, she advised father to return with E.M. in two to three weeks for a follow-up full body x-ray. Ms. Hornor explained, "I knew these two fractures * * * didn't happen at the same time that all the bruising on her body occurred and I was concerned that fractures had also occurred when she received all the bruises." (Tr. 26.) Father complied, and the follow-up x-rays revealed additional newer fractures, which Ms. Hornor believed were to E.M.'s hand and foot.

{¶ 10} Ms. Hornor was asked whether father gave her an explanation for the injuries sustained along with the bruising. In response, Ms. Hornor relayed an account of the incident in appellant's car that was substantially similar to the story given by father during his testimony. Ms. Hornor went on to testify that E.M.'s injuries were not consistent with that explanation, stating:

> No, it * * * does not explain the extensive trauma * * * she
> had injuries of multiple ages, so she had old and new
> injuries. And the bruises were to multiple planes of her body
> that you wouldn't expect from one impact, you know,
> like * * * being in the car seat and * * * striking the console

> with one part of your body, * * * so that history didn't explain all of the injuries on her body.

(Tr. 32-33.) Ms. Horner testified that, given the level of bruising on E.M., she would expect a parent to seek medical care for the child. To Ms. Hornor's knowledge, E.M. did not received medical care prior to being seen at Mt. Carmel. Ultimately, E.M. did not need any medication or surgery to treat or correct her injuries. Ms. Hornor noted appellant was not present during either of her examinations.

{¶ 11} Meghann Round, E.M.'s ongoing caseworker through FCCS and the complainant, also testified. She had been interacting with appellant, father, and E.M. during home visits and supervised office visits from August 2011 up to the hearing. Ms. Round found E.M. was well-bonded with appellant, that appellant cared about E.M., and that appellant was a loving mother. Appellant told Ms. Round that she did not take E.M. to the hospital because she was worried FCCS would get involved. Ms. Round also testified that appellant's boyfriend, during the time period in question, had a criminal history, which included a domestic violence incident involving injuries to his stepson.

{¶ 12} Appellant was also called to the stand during the hearing, but she chose to exercise her Fifth Amendment right against self-incrimination. She did not answer any questions beyond stating her name, her birth date, and that she was legally married.

{¶ 13} Following the hearing, the magistrate issued a decision finding the state established, by clear and convincing evidence, that E.M. was an abused, neglected, and dependent child in accordance with the four causes of action set forth in the complaint. The decision was filed on June 11, 2012 and adopted by the trial court the same day. It did not contain detailed findings of fact and conclusions of law; thus, appellant subsequently filed a request for written findings of fact and conclusions of law. In the meantime, the magistrate held a dispositional hearing on June 26, 2012. The magistrate deemed E.M. a ward of the court and granted temporary custody to father with court ordered protective supervision by FCCS. The magistrate approved a case plan governing appellant and father's behavior and adopted it as an order of the court. Appellant was permitted visitation. The matter was set for review in 250-270 days. The trial court adopted said disposition on July 3, 2012.

{¶ 14} On July 23, 2012, the magistrate issued findings of fact and conclusions of law. The magistrate summarized the testimony given by father, Ms. Hornor, and Ms. Round. He noted that appellant invoked the Fifth Amendment. The magistrate concluded, based on the testimony, the evidence presented, and his opportunity to view the demeanor of the witnesses, that the state met its burden of proving E.M. was an abused, neglected, and dependent child as set forth in the complaint. In particular, he noted:

> Testimony was uncontroverted that [E.M.] suffered injury as a result of [appellant's] failure to secure [E.M.] in her car seat correctly. In addition, testimony was uncontroverted that [E.M.] had multiple fractures dating from at least two different time periods where no explanation was offered for the fracture injuries at trial. [Appellant] failed to seek medical care for her child out of fear that FCCS may become involved in the matter. As a result, an extremely important medical examination, namely the CT scan, was delayed due to [appellant's] failure to act.

(R. 64, 2.) The trial court adopted the magistrate's findings of fact and conclusions of law the same day they were issued.

{¶ 15} On August 3, 2012, appellant filed objections to the magistrate's decision. Once transcripts of the proceedings were prepared, she supplemented those objections on October 12, 2012. Appellant lodged six numbered objections. On March 5, 2013, the trial court overruled all of appellant's objections. The trial court also noted that appellant was charged with child endangerment based on her failure to secure E.M.'s car seat properly, citing Franklin County Municipal Court case No. 2011 CRB 20733. Appellant timely appealed the March 5, 2013 judgment to this court.

## II. ASSIGNMENTS OF ERROR

{¶ 16} Appellant presents us with two assignments of error for review:

> [I.] THE TRIAL COURT ERRED WHEN IT FOUND THAT THE LAW REQUIRED A PARENT TO OBTAIN A MEDICAL DIAGNOSIS FOR "ANY CHILD SUFFERING FROM POTENTIAL ILLNESS, INJURY OR OTHER HEALTH ISSUES" EVEN IN CASES WHERE NO MEDICAL TREATMENT WAS REQUIRED OR NEEDED AND THE CHILD SUFFERED NO HARM FROM THE FAILURE TO

OBTAIN A MEDICAL DIAGNOSIS AND FURTHER ERRED WHEN IT DETERMINED THAT THE CHILD WAS ABUSED, NEGLECTED, AND DEPENDENT IN THE ABSENCE OF CLEAR AND CONVINCING EVIDENCE.

[II.] THE TRIAL COURT ERRED WHEN IT OVERRULED THE APPELLANT'S OBJECTION TO THE INTRODUCTION OF INADMISSIBLE HEARSAY EVIDENCE.

## III. DISCUSSION

{¶ 17} We will address appellant's second assignment of error first, for ease of discussion. Under that assignment of error, appellant limits her argument to alleged hearsay delivered by Ms. Hornor. She complains the trial court erred in allowing Ms. Horner to testify regarding information she received from the radiologist indicating the approximate dates E.M. sustained broken bones. Appellant also argues the trial court erred in allowing Ms. Horner to repeat the explanation for E.M.'s injuries she was given by father.

{¶ 18} A trial court has broad discretion in determining whether to admit or exclude evidence, and an appellate court will not disturb the trial court's determination absent an abuse of discretion. *State Farm Mut. Auto. Ins. Co. v. Anders*, 197 Ohio App.3d 22, 2012-Ohio-824, ¶ 9 (10th Dist.), citing *Krischbaum v. Dillon*, 58 Ohio St.3d 58, 66 (1991). An "abuse of discretion" implies that the court acted in an unreasonable, arbitrary or unconscionable manner. *Banford v. Aldrich Chem. Co., Inc.*, 126 Ohio St.3d 210, 2010-Ohio-2470, ¶ 38, citing *State ex rel. Sartini v. Yost*, 96 Ohio St.3d 37, 2002-Ohio-3317. Even upon a showing of an abuse of discretion, a reviewing court will not overturn a trial court's evidentiary ruling unless the appellant also establishes that the abuse of discretion caused material prejudice to her. *Anders* at ¶ 9, citing *Banford* at ¶ 38.

{¶ 19} During the adjudicatory hearing, Ms. Hornor testified about the approximate age of fractures that pre-dated E.M.'s bruising. Ms. Hornor admitted that she was not able to determine the age of fractures by reading an x-ray on her own, and she relied on a pediatric radiologist to do that. Accordingly, appellant argues that Ms. Hornor was simply repeating in court what she was told by the radiologist regarding the approximate dates fractures were sustained, and those statements were inadmissible hearsay. She further argues she was prejudiced by the testimony because the trial court

"probably" relied on the approximate dates to determine E.M. was an abused, neglected, and dependent child.  (Appellant's brief, 22-23.)  We disagree.

{¶ 20} Hearsay is defined as a statement other than one the declarant made at trial offered into evidence to prove the truth of the matter asserted.  *In re C.S.*, 10th Dist. No. 11AP-667, 2012-Ohio-2988, ¶ 10; Evid.R. 801.  The statements in question were not hearsay because Ms. Hornor did not offer them to prove the truth of the matter asserted, i.e., that E.M. sustained the fractures at the particular points in time the radiologist approximated.  *See In re Application of McKinney*, 134 Ohio St.3d 260, 2012-Ohio-5635, ¶ 18.

{¶ 21} Ms. Hornor testified that, during E.M.'s initial visit to CAC, she ordered a full body x-ray "to look for any old or new fractures."  (Tr. 20.)  Upon reviewing the initial x-rays with the radiologist, Ms. Hornor learned that E.M. had fractures that pre-dated her bruising.  This, coupled with Ms. Hornor's knowledge that new fractures oftentimes do not show in x-rays until they begin to heal, prompted her to advise father to bring E.M. back for follow-up x-rays in two to three weeks.  Those x-rays revealed newer fractures.  Thus, Ms. Hornor knew that E.M. sustained fractures at different points in time.  Ms. Hornor's testimony regarding what the radiologist told her about the approximate age of E.M.'s fractures was not offered to prove the dates E.M. sustained those fractures.  Instead, the testimony was offered to explain Ms. Hornor's actions in assessing E.M.'s injuries and her findings.  The testimony, therefore, was not hearsay.  *See Rex v. Univ. of Cincinnati College of Med.*, 10th Dist. No. 13AP-397, 2013-Ohio-5110, ¶ 13-14, 16.  Accordingly, the trial court did not err or abuse its discretion in overruling appellant's hearsay objections.

{¶ 22} Furthermore, appellant's argument that she was prejudiced by the testimony is undermined by the magistrate finding "testimony was uncontroverted that [E.M.] had multiple fractures dating from at least two different time periods."  (R. 64, 2.)  If the magistrate accepted Ms. Hornor's testimony about what she was told by the radiologist for the truth of the matter asserted, the magistrate likely would have found that the evidence showed E.M. sustained fractures at a minimum of three points in time.

{¶ 23} Appellant's argument that it was prejudicial for the trial court to allow Ms. Hornor's account of the explanation she received from father about the incident is,

likewise, unpersuasive. Father provided substantially the same story during his own testimony. The trial court was provided with the story as the only explanation for E.M.'s injuries, regardless. Appellant does not argue that the trial court improperly allowed father to testify about what appellant told him, and we will not develop arguments for appellant that she has not properly brought before this court. *See Huffer v. Brown*, 10th Dist. No. 12AP-1086, 2013-Ohio-4384, ¶ 11. In sum, appellant has not established the trial court abused its discretion or that she was materially prejudiced by the trial court's evidentiary rulings. Accordingly, appellant's second assignment of error is overruled.

{¶ 24} Under her first assignment of error, appellant argues the trial court erred in determining E.M. was an abused, neglected, and dependent child because the elements of the causes of action were not met, and the determination was not supported by clear and convincing evidence.

{¶ 25} Finding a child to be an abused, neglected or dependent child must be supported by clear and convincing evidence of that status. R.C. 2151.35; *In re L.C.*, 10th Dist. No. 12AP-1057, 2013-Ohio-2564, ¶ 7, citing *In re N.P.*, 10th Dist. No. 07AP-797, 2008-Ohio-1727, ¶ 7. Clear and convincing evidence is more than a mere preponderance, it is the quantum of evidence which will produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established. *L.C.* at ¶ 7, citing *M.P.* at ¶ 7. On review, we must affirm the trial court if competent, credible evidence going to all the essential elements of the case supports the trial court's judgment. *Id.*

{¶ 26} The trial court's judgment was based on the following four statutes: R.C. 2151.031(C) and (D), 2151.03(A)(2), and 2151.04(C).

{¶ 27} R.C. 2151.031 provides in pertinent part:

> As used in this chapter, an "abused child" includes any child who:
>
> * * *
>
> (C) Exhibits evidence of any physical or mental injury or death, inflicted other than by accidental means, or an injury or death which is at variance with the history given of it. * * *

(D) Because of the acts of his parents, guardian, or custodian, suffers physical or mental injury that harms or threatens to harm the child's health or welfare.

{¶ 28} R.C. 2151.03 provides in pertinent part:

(A) As used in this chapter, "neglected child" includes any child:

* * *

(2) Who lacks adequate parental care because of the faults or habits of the child's parents, guardian, or custodian.

{¶ 29} R.C. 2151.04 provides in pertinent part:

As used in this chapter, "dependent child" means any child:

* * *

(C) Whose condition or environment is such as to warrant the state, in the interests of the child, in assuming the child's guardianship.

{¶ 30} Appellant's argument focuses on the fact that E.M. did not need any medication or surgery to help her heal from her injuries. Therefore, appellant contends, she was justified in not seeking medical attention for E.M., and E.M. should not have been adjudicated an abused, neglected, and dependent child. We disagree. Appellant's argument ignores a great deal of evidence in the record that supports the trial court's judgment in accordance with the above statutes.

A. *Abuse under R.C. 2151.031(C) and (D)*

{¶ 31} We will address whether E.M. was properly adjudicated an abused child under both subsections (C) and (D) together. It is undisputed that E.M. was in the care of appellant when she suffered injuries, including multiple broken bones, extensive bruising to several areas of her body, and a ruptured eardrum. The only explanation provided for E.M.'s injuries was that appellant strapped her into her car seat, but appellant did not secure the car seat to the seat itself. Thus, when a sudden stop occurred, E.M. was propelled forward while still in her car seat and she impacted a console or the back of a seat. Ms. Hornor, a pediatric nurse practitioner that examined E.M. head to toe, testified,

quite clearly, that E.M.'s injuries were at variance with that explanation.  The magistrate's findings reflect that he found Ms. Hornor credible, and the evidence adduced through her competent.  We arrive at the same conclusion and find that sufficient evidence supports E.M. was an abused child under R.C. 2151.031(C) and (D).

B. *Neglect under R.C. 2151.03(A)(2)*

{¶ 32} "Adequate parental care," as referenced in R.C. 2151.03(A)(2), means "the provision by a child's parent * * * of adequate food, clothing, and shelter to ensure the child's health and physical safety and the provision by a child's parent * * * of specialized services warranted by the child's physical or mental needs."  R.C. 2151.011(B)(1).

{¶ 33} The testimony presented at trial established that E.M.'s injuries occurred while she was in the care of appellant, and appellant did not seek medical care for E.M.  Father's testimony indicated that the injuries existed for three to four days before E.M. was returned to him, and appellant extended the time she had E.M. while injured for an extra day.  Father and Ms. Round both testified that appellant told them she did not take E.M. to the hospital because she was afraid FCCS would intervene.  Once E.M. was seen at Mt. Carmel and a serious head injury was ruled out, father was directed to take E.M. to CAC for more specialized testing and care.  An additional visit to CAC was necessary to identify and document all of E.M.'s broken bones, and Ms. Hornor testified that she would expect a parent to seek medical care for E.M. based on her outward appearance, i.e., the extensive bruising.  The magistrate found, due to appellant's failure to act, "an extremely important medical examination, namely the CT scan, was delayed."  (R. 64.)  Similarly, we find that competent, credible evidence supports that appellant's behavior delayed E.M.'s access to medical services that were warranted by her physical condition.  Thus, the trial court's determination that E.M. was a neglected child under R.C. 2151.03(A)(2) will stand.

C. *Dependency under R.C. 2151.04(C)*

{¶ 34} "A finding of dependency under R.C. 2151.04 focuses on whether the child is receiving proper care and support.  Therefore, the determination must be based on the condition or environment of the child, not the fault of the parents.  However, a court may consider a parent's conduct insofar as it forms part of the child's environment."  (Internal citations omitted.)  *L.C.* at ¶ 20.  Given our discussion above and the trial court's expertise

in determining dependency, we have little doubt that E.M.'s condition warranted the state in assuming her guardianship.  Competent, credible evidence in the record supports the determination that E.M. was a dependent child.  Therefore, we will not disturb that finding.  Accordingly, appellant's first assignment of error is overruled.

## IV.  CONCLUSION

{¶ 35} For the foregoing reasons, appellant's two assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, is affirmed.

*Judgment affirmed.*

SADLER, P.J., and DORRIAN, J., concur.

_____