[Cite as *Croce v. Ohio State Univ. Bd. of Trustees*, 2024-Ohio-2138.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

Dr. Carlo M. Croce,                         :

        Plaintiff-Appellant,           :           No. 23AP-445
                                                 (Ct. of Cl. No. 2022-00187JD)

v.                                  :

                                               (REGULAR CALENDAR)
The Ohio State University Board      :
of Trustees,

                                            :

        Defendant-Appellee.                :

                                            :

D E C I S I O N

Rendered on June 4, 2023

**On brief:** *Johrendt & Holford*, and *Andrew Mills Holdford*, for appellant. **Argued:** *Andrew Mills Holdford*.

**On brief:** *Dave Yost*, Attorney General, and *Peter Demarco*; *Carpenter Lipps LLP*, and *Michael H. Carpenter*, *Timothy R. Bricker*, *Michael N. Beekhuizen*, and *Gregory Dick*, special counsel for appellee. **Argued:** *Timothy R. Bricker*.

APPEAL from the Court of Claims of Ohio

BOGGS, J.

{¶ 1} Plaintiff-appellant, Dr. Carlo M. Croce, appeals from a judgment entered by the Court of Claims of Ohio dismissing, pursuant to Civ.R. 12(C), his complaint against defendant-appellee, The Ohio State University ("OSU") Board of Trustees. For the following reasons, we reverse in part and affirm in part.

## I.  FACTS AND PROCEDURAL HISTORY[1]

{¶ 2}  On March 4, 2022, appellant filed a complaint against appellee asserting breach of contract (Count One), violation of his constitutional rights (Count Two), and declaratory judgment and injunctive relief (Count Three).  According to the complaint, appellant is one of the top cancer research scientists in the world, earning him multiple awards over his decades-long career.  Appellant has been an employee of the OSU College of Medicine since 2004.

{¶ 3}  In early March 2017, appellant was the subject of what appellant terms a "defamatory article" by The New York Times.  (Compl. at ¶ 11.)  According to the complaint, the author of that article sent a letter of inquiry to appellee asking for information about accusations of research misconduct against appellant.  Between March of 2017 and April of 2019, appellee instituted research misconduct proceedings against appellant based on the allegations of a few complainants that were either anonymous or who used an alias.  The research misconduct proceedings were subject to OSU's "University Policy and Procedures Concerning Research Misconduct * * * as well as related Faculty Rules, state law and the Ohio Constitution."  (Compl. at ¶ 14.)  The complaint references Chapter 3335-5 of the OSU Board of Trustees Bylaws and Rules as governing the process for "Faculty, Governance and Committees at OSU" and, specifically, "Chapter 3335-5-04, *et seq*.," as applying to the procedure for complaints of misconduct made against faculty members.  (Compl. at ¶ 15.)

{¶ 4}  Appellant asserted that appellee harmed him during and after the research misconduct proceedings in four primary ways: (1) by conducting a prolonged investigation; (2) by involving multiple people in the investigation who had undisclosed conflicts of interest; (3) by failing to rehabilitate appellant's reputation following a finding that appellant did not commit research misconduct; and (4) by taking inappropriate administrative non-disciplinary actions against appellant, including removing appellant as the John W. Wolfe Chair in Human Cancer Genetics (the "Wolfe Chair").

{¶ 5}  First, concerning the prolonged investigation, appellant alleged that, although such research proceedings are allotted 120 days to complete pursuant to the applicable policy, *University Policy and Procedures Concerning Research Misconduct, IV*

---

[1] The facts reflect the allegations in the complaint, which are presumed to be true under the Civ.R. 12(C) standard, and do not otherwise establish the facts of this case for other purposes.

*Procedures, Section F.2* – Time Requirements, OSU took four years to complete the proceedings. As a result of the delay, appellant alleged he was unable to pursue alternative economic opportunities and he has not received any additional consulting income since 2017.

{¶ 6} Second, appellant alleged appellee violated its policy against conflicts of interest during the research misconduct investigation. The policy in place during the investigation, *University Policy and Procedures Concerning Research Misconduct, Section V.* Miscellaneous Matters, stated:

> *D. Conflicts of Interest.* At each stage of handling an inquiry or subsequent investigation, **all persons involved shall be vigilant to prevent any real or perceived conflict of interest**, or personal conflicts or relationships between colleagues, from affecting the outcome of the proceedings and resolution of the allegations.
>
> * * *
>
> **If any prospective Committee member or consultant** at any point in the process presents or develops a conflict of interest, that Committee member or consultant at any point develops a conflict of interest, that Committee member or consultant shall be replaced by another appointee of the appointing authority. **If the Dean or Coordinator has a conflict**, the Vice President for Research shall designate a different person to handle that case. **If either of the Vice President for Research or the Executive Vice President for Academic Affairs and Provost has a conflict of interest**, the President of the University shall designate a replacement. Conflicts of interest on the parts of deans or department chairs shall be dealt with by the Vice President for Research. If it becomes necessary to appoint a replacement during the course of the process, the new appointee shall be fully informed regarding earlier procedures and evidence secured, but it shall not be required that any of the process commence anew.

(Emphasis in original.)  (Compl. at ¶ 33.)

{¶ 7} According to the complaint, "[a]t all times during the research misconduct proceedings against [appellant], OSU, the [College of Medicine Investigation Committee ("COMIC")], its predecessors, Dr. Peter Mohler and John and Jane Does I-III possessed

both real and perceived conflicts of interest and also failed to disclose same in violation of the applicable policy and law." (Compl. at ¶ 37.) Appellant also alleged, upon information and belief, that OSU, John and Jane Does I-III and the COMIC worked in concert with and were aided and abetted by an individual or "consultant" with an actual, as well as a perceived conflict of interest during the research misconduct proceedings, that the individual or "consultant" was a complainant in the research misconduct proceedings, and this individual acted with malice and ill will toward appellant in retribution for appellant pursuing redress in the state and federal courts. (Compl. at ¶ 43.)

{¶ 8} Third, appellant alleged that, although the final report of the investigation found "both by clear and convincing evidence and a preponderance of the evidence that there **was insufficient evidence to make any finding of research misconduct** against Dr. Croce," appellee failed to rehabilitate appellant's reputation. (Emphasis sic.) (Compl. at ¶ 25.) He cites to *University Policy and Procedures Concerning Research Misconduct, Section V*. Miscellaneous Matters, which states:

> *K. Rehabilitation.* In any case in which a Respondent is found not to have committed research misconduct, any reference to the case shall be removed from the files of the University including the personnel file of the Respondent, except that an official file shall be kept by either the Executive Vice President for Academic Affairs and Provost or by the Vice President for Research, as provided for in E above. The Vice President for Research or Coordinator shall be responsible for exercising reasonable efforts to accomplish such removal. ***The University shall also work with the Respondent to rectify any injury done to the reputation of Respondent, including, with the permission of Respondent, release of a press announcement of the results of the investigation. The steps to be taken to accomplish rehabilitation of the Respondent, including any requested economic rehabilitation, shall be at the discretion of the Vice President for Research.***

(Emphasis sic.) (Compl. at ¶ 28.) Appellant submitted through counsel a request for remediation on November 5, 2021, which he attached to the complaint, and asserted he had not received a formal response.

{¶ 9} Finally, appellant alleged that, despite confirming the no-misconduct finding of the final report and acknowledging its duty to rehabilitate appellant's reputation,

appellee through Dr. Carol R. Bradford, took the following "inconsistent and unlawful" administrative non-disciplinary actions against appellant:

> a. The removal of his discretionary Endowed Chair appointment as the John W. Wolfe Chair in Human Cancer Genetics ("the Chair") effective September 7, 2021;
>
> b. A requirement that all original data for grant applications, manuscripts or abstracts be presented to a committee of three unqualified faculty members;
>
> c. A requirement to develop a redundant data management plan for all visiting scholars, junior faculty, staff and students working in [appellant]'s laboratory; and
>
> d. A requirement that [appellant] retake CITI training responsible conduct in research coursework despite being current in same.

(Compl. at ¶ 26-27, citing Ex. 1, Sept. 2, 2021 letter from Dr. Bradford.)

{¶ 10} Appellant alleged these actions were contrary to its legal obligation to reimburse his costs and expenses associated with the research misconduct investigation and to rehabilitate his reputation under OSU's policy. Specific to his removal as the Wolfe Chair, appellant alleged in his complaint that his removal from that "discretionary * * * appointment" is "without binding effect as the entire process of the research misconduct proceedings were tainted by procedural irregularities and real and perceived conflicts of interest." (Compl. at ¶ 48, 50.)

{¶ 11} As a result of the prolonged four-year investigation, the violation of OSU's conflict of interest policy during the investigation, OSU's failure to act in accordance with its own remediation policy, and OSU's removal of appellant as the Wolfe Chair among other non-disciplinary actions, appellant asserted he was and still is being "deprived of his contractual rights and vested property interest without due process" and OSU violated the law "contrary to OSU Faculty Rules, state law and the Ohio Constitution." (Compl. at ¶ 24, 32, 47, 52.)

{¶ 12} Appellant sought compensatory and punitive damages, costs and attorney's fees, a declaration that appellee failed to comply with OSU faculty rules, state law, and the Ohio Constitution, an order reinstating appellant to the Wolfe Chair and enjoining OSU from further attempting to remove appellant until they have complied with applicable rules

and laws; and an order compelling OSU to advertise in the national media stating appellant was exonerated from all the research misconduct allegations, and any other equitable relief the court deems proper. Appellant attached two exhibits to the complaint: the September 2, 2021 letter from Dr. Bradford, and the November 5, 2021 letter from appellant's counsel to Dr. Grace Wang requesting remediation and reimbursement under Section V, part K of OSU's policy concerning research misconduct.

{¶ 13} Appellee filed an answer denying any non-compliance with applicable rules, laws, and provisions of the Ohio Constitution, denying it had not responded to appellant's letter requesting remediation, and asserting multiple defenses. On July 22, 2022, appellee filed a motion for judgment on the pleadings pursuant to Civ.R. 12(C). As grounds to support the Civ.R. 12(C) motion, appellee contended that appellant's breach of contract claims: are preempted, either under field preemption or conflict preemption, by the federal scheme governing research misconduct; violate appellee's immunity under the public duty rule; and improperly seek to hold appellee liable for exercising its contractually conferred discretion with respect to remedial measures.

{¶ 14} Regarding appellant's constitutional claims, appellee contended those claims cannot be raised in the court of claims since that court lacks jurisdiction to hear and decide constitutional claims. Similarly, appellee contended the court of claims could not hear or decide appellant's equitable claims. Appellee further asked the trial court for declaratory and injunctive relief, since the contract claims presented are meritless and the court of claims lacks jurisdiction over equitable claims standing on their own. However, if the court of claims considered the equitable claims, appellee argued its decision to remove appellant as the Wolfe Chair is an academic decision that is entitled to deference. As a result, appellee asserted it is entitled to judgment on the pleadings.

{¶ 15} On September 12, 2022, appellant filed a memorandum in opposition to appellee's motion for judgment on the pleadings. Within it, appellant argued that preemption does not apply to appellant's state law breach of contract claims and declaratory judgment, that immunity does not apply, and his contract and declaratory judgment claims were sufficiently pleaded to avoid dismissal. Appellee filed a reply on October 7, 2022.

{¶ 16} The trial court issued a decision and judgment entry on July 9, 2023 granting appellee's motion for judgment on the pleadings and dismissing appellant's complaint. In doing so, the trial court first found the public duty rule did not apply to bar appellant's breach of contract claims since, making all reasonable inferences in appellant's favor, appellant showed he had an employment relationship with appellee and that appellee's policies and procedures govern the investigation of research misconduct. The trial court next determined that appellant failed to state a claim for relief under a breach of contract theory regarding his criticisms of how the research misconduct proceedings were handled— the length of time of the investigation, the alleged conflicts of interest present during the investigation, and general complaints about the investigation process—since those issues are preempted by federal law. Citing to a case that determined the Bankruptcy Code preempts state law claims that allow for recovery of damages for misconduct committed during bankruptcy proceedings, the trial court explained, "[a]ny allegations regarding the research misconduct investigation are preempted by federal law * * * because Congress has established a comprehensive legislative scheme intended to promote the uniformity of research misconduct proceedings by universities using federal funds." (June 9, 2023 Decision at 11, citing *PNH, Inc. v. Alfa Laval Flow, Inc.*, 130 Ohio St.3d. 278, 2011-Ohio-4398, ¶ 31.)

{¶ 17} Furthermore, the trial court determined appellant did not allege facts that would give rise to a breach of contract claim as a matter of law with regard to appellee failing to rehabilitate appellant's reputation and reimburse him for legal expenses, and in removing appellant as the Wolfe Chair and taking other non-disciplinary actions. The trial court noted that appellee is authorized under 42 C.F.R. § 93.319 to take action under its own internal standards of conduct, which may differ from the federal standard for research misconduct. Moreover, "[e]ven making all reasonable inferences in [appellant]'s favor, the actions that [appellee] took at the conclusion of the investigation were at its discretion, as stated in Section K of the policy[,]" and a party cannot breach an agreement by merely exercising its contractually conferred discretion. (Decision at 13.)

{¶ 18} Finally, the trial court determined that because appellant failed to state a claim for breach of contract, his claim for declaratory judgment fails as well, and that the Court of Claims is without jurisdiction to consider appellant's constitutional claims. As a

result, the trial court granted appellee's motion for judgment on the pleadings and dismissed appellant's complaint.

## II.  ASSIGNMENTS OF ERROR

{¶ 19} Appellant timely appeals and assigns the following four assignments of error for our review:

> ASSIGNMENT OF ERROR NO. 1: Under Civ. R. 12(C), a trial court errs as a matter of law by finding implied preemption of common law breach of contract claims based, in part, on "internal standards of conduct" expressly permitted under the regulatory scheme — ([42] U.S.C.A 289b and 42 C.F.R § [93.]100, et seq; 42 C.F.R. § 93.319) (*See Entry of Dismissal dated June 9, 2023, Appellant's Appendix A*).

> ASSIGNMENT OF ERROR NO. 2: Under Civ. R. 12(C), a trial court errs as a matter of law by dismissing common law breach of contract claims where it finds discretion applies to only part of the contract. (*See Entry of Dismissal dated June 9, 2023, Appellant's Appendix A*).

> ASSIGNMENT OF ERROR NO. 3: Under Civ. R. 12(C), a trial court errs as a matter of law by dismissing a common law breach of contract claim for lost income when it misapplies the expectancy measure of damages.  (*See Entry of Dismissal dated June 9, 2023, Appellant's Appendix A*).

> ASSIGNMENT OF ERROR NO. 4: Under Civ. R. 12(C), a trial court abuses its discretion and errs as a matter of law by dismissing a complementary declaratory judgment action where a breach of contract is also alleged. (*See Entry of Dismissal dated June 9, 2023, Appellant's Appendix A*).

## III.  LEGAL ANALYSIS

{¶ 20} Appellant's four assignment of errors collectively challenge the trial court's determination to dismiss his complaint under the parameters of Civ.R. 12(C), which permits a party to move for judgment on the pleadings after the pleadings are closed but within such time as not to delay the trial.  When the defendant moves for judgment on the pleadings, " '[d]ismissal is appropriate under Civ.R. 12(C) when (1) the court construes as true, and in favor of the nonmoving party, the material allegations in the complaint and all reasonable inferences to be drawn from those allegations and (2) it appears beyond doubt

that the plaintiff can prove no set of facts that would entitle him or her to relief.' " *Maternal Grandmother, ADMR v. Hamilton Cty. Dept. of Job & Family Servs.*, 167 Ohio St.3d 390, 2021-Ohio-4096, ¶ 13, citing *Reister v. Gardner,* 164 Ohio St.3d 546, 2020-Ohio-5484, ¶ 17, citing *State ex rel. Midwest Pride IV, Inc. v. Pontious*, 75 Ohio St.3d 565, 570 (1996). *See Cool v. Frenchko*, 10th Dist. No. 21AP-4, 2022-Ohio-3747, ¶ 21 ("A motion for judgment on the pleadings is essentially a motion to dismiss for failure to state a claim after an answer has been filed.")

{¶ 21} Because a trial court's ruling on a motion for judgment on the pleadings presents only questions of law, appellate courts review such a ruling de novo. *Maternal Grandmother* at ¶ 13; *Cool* at ¶ 21. In reviewing a Civ.R. 12(C) motion for judgment on the pleadings, a court must remain mindful that a plaintiff need not prove its case at the pleading stage. *Hinkle v. L Brands, Inc. World Headquarters*, 10th Dist. No. 21AP-80, 2021-Ohio-4187, ¶ 9, citing *York v. Ohio State Hwy. Patrol*, 60 Ohio St.3d 143, 144-45 (1991). Within this context, the Supreme Court of Ohio has emphasized, "Ohio is a notice-pleading state." *Maternal Grandmother* at ¶ 10, citing *Wells Fargo Bank N.A. v. Horn*, 142 Ohio St.3d 416, 2015-Ohio-1484, ¶ 13. "This means that outside of a few specific circumstances, such as claims involving fraud or mistake, *see* Civ.R. 9(B), a party will not be expected to plead a claim with particularity." *Maternal Grandmother* at ¶ 10. Rather, " 'a short and plain statement of the claim' will typically do." *Id.* citing Civ.R. 8(A).

### A. First Assignment of Error

{¶ 22} In his first assignment of error, appellant asserts the trial court erred as a matter of law by determining the breach of contract action was impliedly preempted by federal law. In response, appellee argues the trial court was correct to conclude appellant's breach of contract claims should be dismissed due to federal field or conflict preemption, or, alternatively, the claims should be dismissed since the state has immunity pursuant to the public duty rule. For the following reasons, we conclude the trial court properly determined the public duty rule is inapplicable on the facts of this case and that federal preemption barred those breach of contract claims challenging appellee's implementation of the federally mandated research misconduct proceedings.

### 1. State Immunity and the Public Duty Rule

{¶ 23} Appellee argues that OSU's obligation to investigate research misconduct under 42 C.F.R. § 93.100 is a public duty and as such OSU is immune from these claims under R.C. 2743.02(A)(3)(a) and 2743.01(E)(1).[2]  For the following reasons, we disagree with appellee.

{¶ 24} "Under the doctrine of sovereign immunity, 'a state is not subject to suit in its own courts unless it expressly consents to be sued.' " *Smith v. Ohio State Univ.*, ___ Ohio St.3d. ___, 2024-Ohio-764, ¶ 12, quoting *Proctor v. Kardassilaris*, 115 Ohio St.3d 71, 2007-Ohio-4838, ¶ 7. "The Ohio Constitution as amended in 1912 allows '[s]uits [to] be brought against the state, in such courts and in such manner, as may be provided by law.' " *Smith* at ¶ 12, quoting Ohio Constitution, Article I, Section 16.

{¶ 25} The state "waived sovereign immunity with respect to certain claims and consented to be sued and have its liability determined in the Court of Claims" through R.C. 2743.01 et seq., the Court of Claims Act.  *Smith* at ¶ 14.  Under the Court of Claims Act, the Court of Claims "has exclusive, original jurisdiction of all civil actions against the state permitted by the waiver of immunity contained in [R.C. 2743.02]."  R.C. 2743.03(A)(1). The Court of Claims also has "exclusive, original jurisdiction of all civil actions against the Ohio state university board of trustees," except where the claimant only seeks declaratory judgment, injunctive relief, or other equitable relief against the state in a civil action.  R.C. 3335.03(B); R.C. 2743.03(A)(3)(a). Where claims for injunctive or declaratory relief are ancillary to a claimant's civil suits against the state for money damages, the court of claims also has jurisdiction over those claims.  R.C. 2743.03(A)(2); *Smith* at ¶ 14.

{¶ 26} The waiver of immunity referenced in R.C. 2743.03(A)(1) is set forth in R.C. 2743.02(A)(1). Under that section, the state "waives its immunity from liability, * * * and consents to be sued, and have its liability determined, * * * in accordance with the same rules of law applicable to suits between private parties" but "subject to the limitations set

---

[2] We note the Supreme Court of Ohio recently held that discretionary immunity involves a "jurisdictional bar * * * to suits brought against the state in the Court of Claims." *Smith v. Ohio State Univ.*, ___ Ohio St.3d. ___, 2024-Ohio-764, ¶ 10 (determining discretional immunity is not an affirmative defense that may be waived but instead a matter of the Court of Claims' subject-matter jurisdiction).  The reasoning of *Smith* centered on its assessment of the meaning of R.C. 2743.02(A)(1) and conclusion that the state has not waived its sovereign immunity for "highly discretionary decisions pursuant to its legislative, judicial, executive, or planning functions." *Smith* at ¶ 16.  The *Smith* decision did not discuss the public duty rule or the Court of Claims "exclusive, original jurisdiction of all civil actions against the Ohio state university board of trustees," which is "[i]n addition to" jurisdiction under R.C. 2743.03(A)(1) and does not expressly incorporate the R.C. 2743.03(A)(1) "waiver of immunity" provision. *See* R.C. 3335.03(B); R.C. 2743.03(A)(3)(a).

forth in this chapter." R.C. 2743.02(A)(1). Such a limitation to the waiver of immunity is provided in R.C. 2743.02(A)(3)(a), which states "the state is immune from liability in any civil action or proceeding involving the performance or nonperformance of a public duty." A "public duty" is defined, in pertinent part, as "any statutory, regulatory, or assumed duty" to "monitor" and "investigat[e]." R.C. 2743.01(E)(1)(a).

{¶ 27} Here, it is undisputed that appellee accepted federal funds for biomedical or behavioral research. In such a situation, appellee, by federal regulation, has the primary responsibility for responding to allegations of research misconduct in accordance with the federal code. 42 C.F.R § 93.100(b). The code further directs that appellee must establish and follow policies and procedures to review and respond to allegations of research misconduct associated with federally supported biomedical and behavioral research, including a process for inquiry and, if warranted, investigation into to the allegations. *See* 42 C.F.R § 93.300-04 (describing required policies and procedures and mandated compliance); 42 C.F.R § 93.312, 315 (defining inquiry and regulating specifics of initial inquiry into allegations); 42 C.F.R § 93.215, 310-11, 315 (defining investigation and regulating specifics of institutional investigations). Because appellee has a regulatory duty to investigate research misconduct allegations arising from federally supported biomedical and behavioral research, the statutory definition of "public duty" is met under R.C. 2743.01(E)(1)(a) as to those claims arising under that duty.

{¶ 28} However, the public duty exception to the state's waiver of immunity does not apply where there is a "special relationship" between the state and plaintiff. R.C. 2743.02(A)(3)(b); R.C.2743.01(E)(2). A special relationship to satisfy R.C. 2743.02(A)(3)(b) is demonstrated if all of the following elements exist:

> (i)     An assumption by the state, by means of promises or actions, of an affirmative duty to act on behalf of the party who was allegedly injured;
>
> (ii)    Knowledge on the part of the state's agents that inaction of the state could lead to harm;
>
> (iii)   Some form of direct contact between the state's agents and the injured party;

(iv)     The injured party's justifiable reliance on the state's affirmative undertaking.

R.C. 2743.02(A)(3)(b).  *Banks v. Ohio Bur. of Workers' Comp.*, 10th Dist. No. 17AP-748, 2018-Ohio-5246, ¶ 23, quoting *Rudd v. Ohio State Hwy. Patrol*, 10th Dist. No. 15AP-869, 2016-Ohio-8263, ¶ 13 ("[A]n exception to the public duty doctrine 'allows recovery * * * where a "special relationship," as defined by meeting all elements of a four-part test, is established between the state and the injured party.' ").

{¶ 29} "The absence of factual allegations supporting all elements of the special relationship exception to the public duty rule renders a complaint subject to dismissal pursuant to Civ.R. 12(B)(6)." *Gipson v. Ohio Adult Parole Auth.*, 10th Dist. No. 23AP-390, 2024-Ohio-227, ¶ 16 (affirming dismissal of inmates' complaint where inmates failed to allege facts demonstrating any "special relationship" as defined in R.C. 2743.02(A)(3)(b) between themselves and OAPA so as to overcome the immunity afforded the state by the public duty rule).  However, a plaintiff is not held to a heightened pleading standard when a complaint invokes an exception to a government immunity; notice pleading suffices.  *See Maternal Grandmother* at ¶ 10-11.

{¶ 30} The trial court determined appellant met the bar for establishing a special relationship by alleging he has an employment relationship with appellee and citing to appellee's policies and procedures for investigating research misconduct. We agree. Appellant's complaint alleged an employment relationship with appellee, that appellee directly undertook an investigation into research misconduct leveled against him, and that appellee had in place but allegedly did not follow its policies and procedures for research misconduct investigations, including some additional duties it voluntarily assumed such as appellee's duty to rehabilitate his reputation.  On the facts of this case, appellant established a special relationship under R.C. 2743.02(A)(3)(b) sufficient to avoid dismissal under Civ.R. 12(C).

{¶ 31} The case cited by appellee, *Banks*, 2018-Ohio-5246, does not convince us otherwise.  *Banks* involved an action by a deceased worker's estate administratrix, wherein she alleged in a complaint against the Bureau of Workers Compensation that her husband's death was a result of an industrial accident.  In that case, "the complaint lack[ed] factual

allegations as to all of the elements of the special relationship exception." *Id*. at ¶ 25. As a result, *Banks* is distinguishable and does not support a similar finding here.

{¶ 32} For the reasons stated above, appellee's argument in favor of dismissing appellant's complaint due to state immunity and the public duty rule lacks merit. We therefore proceed to address the parties' contentions regarding federal preemption.

### 2. Federal Preemption

{¶ 33} The basic principles of federal preemption are set forth by the Supreme Court of Ohio in *State ex rel. Yost v. Volkswagen Aktiengesellschaft*, 165 Ohio St.3d 213, 2021-Ohio-2121, ¶ 9-14. The *Volkswagen* court explained that the doctrine of federal preemption originates from the Supremacy Clause of the United States Constitution, which provides, "the Laws of the United States * * * shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." United States Constitution, Article VI, Clause 2. Ohio courts recognize that, under the Supremacy Clause, the United States Congress has the power to preempt state law. *Volkswagen* at ¶ 11, citing *In re Miamisburg Train Derailment Litigation*, 68 Ohio St.3d 255, 259 (1994).

{¶ 34} Congress may preempt state law either expressly or impliedly. *Volkswagen* at ¶ 11. "When Congress expressly preempts state law, it explicitly says so with clear statutory language." *Id*. at ¶ 12, citing *English v. Gen. Elec. Co.*, 496 U.S. 72, 78-79 (1990). Neither party asserts express preemption is at issue in this case since the federal statute and regulations that apply to research misconduct proceedings do not mention preemption.

{¶ 35} Absent clear statutory language, "courts look to congressional intent to determine whether Congress meant to preempt state law"—in other words whether preemption is implied. *Volkswagen* at ¶ 12. Courts generally find implied preemption in two circumstances. The first circumstance is referred to as "field preemption." *Id*. at ¶ 13. Field preemption "occurs when Congress has enacted a legislative and regulatory scheme that is so pervasive ' "that Congress left no room for the States to supplement it" ' or when the legislative and regulatory scheme ' "touch[es] a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.' " *Volkswagen* at ¶ 13, citing *English*, 496 U.S. at 78-79, quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947).

{¶ 36} The second circumstance in which implied preemption is found is referred to as "conflict preemption." *Volkswagen* at ¶ 14. Conflict preemption "occurs when a state law 'actually conflicts with federal law.' " *Id.*, citing *English* at 79. Specifically, a conflict may exist because: (1) compliance with both state and federal law is impossible ("impossibility preemption"); or (2) the state law poses " ' "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" ' " ("obstacle preemption"). *Volkswagen* at ¶ 14, quoting *English* at 79, quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941).

{¶ 37} Preemption is primarily a question of legislative intent and, as such, presents a question of law. *Volkswagen* at ¶ 15. Because preemption generally concerns resolving a question of law, it may be an appropriate basis to dismiss a complaint under Civ.R. 12(C). *See id*; Civ.R. 12(C); *McCruter v. Advantage Imaging of Lake Cty., L.L.C.*, 8th Dist. No. 109778, 2021-Ohio-433, ¶ 13.

{¶ 38} In this case, the trial court determined appellant's claims challenging how the research misconduct proceedings were conducted, including his criticism of the length of time of the investigation, alleged conflicts of interest, and other complaints about the investigation process, are preempted by federal law. Considering the purpose and objectives of the Public Health Services Act and governing regulations, we agree with the trial court.

{¶ 39} In 1993, the Unites States Congress, through the Public Health Services Act, directed the Secretary of the Department of Health and Human Services ("HHS") to promulgate regulations governing research misconduct in connection with biomedical and behavioral research by entities that apply for federal financial assistance. 42 U.S.C. § 289b(a) through (e). Congress required entities to enter an agreement with HHS that they will comply with HHS regulations to receive federal funding for their research. 42 U.S.C. § 289b(b)(2). Congress additionally established the Office of Research Integrity ("ORI") as an independent entity within HHS and authorized ORI, acting in accordance with HHS-prescribed procedures, to conduct investigations or take other actions with respect to research misconduct including, in pertinent part, imposing appropriate remedies, and to "monitor administrative processes and investigations that have been established or carried out" under the law. 42 U.S.C. § 289b(a), (c), (d).

{¶ 40} The regulatory framework to govern investigations of research misconduct supported by federal funds appears at 42 C.F.R. Part 93 (the "Regulations"). The stated purpose of the Regulations is: to establish the responsibilities of the respective government agencies and institutions in responding to research misconduct issues; to define what constitutes misconduct in federally supported research; to establish the general types of administrative actions the government agencies may take in response to research misconduct; to require institutions to develop and implement policies and procedures for reporting and responding to allegations of research misconduct and providing HHS with the assurances necessary to permit the institutions to participate in federally supported research; and to protect the health and safety of the public, "promote the integrity of [federally] supported research and the research process, and conserve public funds." 42 C.F.R. § 93.101. "Any interpretation" of this regulatory framework "must further the policy and purpose of the HHS and the Federal government to protect the health and safety of the public, to promote the integrity of research, and to conserve public funds." 42 C.F.R. § 93.107.

{¶ 41} The Regulations then create "an intricate * * * process by which institutions and the ORI would jointly assess allegations of research misconduct." *Anversa v. Partners Healthcare Sys., Inc.*, 835 F.3d 167, 170 (1st Cir.2016); 42 C.F.R. Part 93. The Regulations specify that HHS and institutions "share responsibility for the integrity of the research process" and delineates the role each holds in the partnership. 42 C.F.R § 93.100(b). "HHS has ultimate oversight authority for [federally] supported research, and for taking other actions as appropriate or necessary, including the right to assess allegations and perform inquiries or investigations at any time." 42 C.F.R § 93.100(b). "Institutions * * * have an affirmative duty to protect [federal] funds from misuse by ensuring the integrity of all [federally] supported work, and primary responsibility for responding to and reporting allegations of research misconduct, as provided in [the regulations]." 42 C.F.R § 93.100(b).

{¶ 42} The Regulations set forth an array of responsibilities for each institution that assumes this role. In part pertinent to this assignment of error, institutions are obligated to respond to allegations of research misconduct in a "thorough, competent, objective and fair manner, including precautions to ensure that individuals responsible for carrying out any part of the research misconduct proceeding do not have un-resolved personal,

professional or financial conflicts of interest with the complainant, respondent or witnesses," must have written policies and procedures for safeguarding against conflicts of interest, and must ultimately conduct a fair investigation that is free of conflicts of interest. 42 C.F.R. § 93.300(b), 42 C.F.R. § 93.304(b), 42 C.F.R. § 93.310(f).

{¶ 43} Institutions must also establish policies and procedures to ensure the response to research misconduct allegations are "within the time limits" established by regulation. 42 C.F.R. § 93.304(b). The Regulation specifies that an institution must "complete all aspects of an investigation within 120 days of beginning it" and, "[i]f unable to complete the investigation in 120 days, the institution must ask ORI for an extension in writing." 42 C.F.R. § 93.311(a) and (b). The Regulations further control the parameters of an institution's inquiry, investigation, reporting of research misconduct proceedings, and record keeping. 42 C.F.R. § 93.307-13, 315-17.

{¶ 44} While a respondent may contest a finding of research misconduct and any imposed HHS administrative actions by requesting an administrative hearing as provided in 42 C.F.R. § 93.500-523, the Regulation empowers ORI, alone, to investigate and take action against intuitions for non-compliance. 42 C.F.R. § 93.400(a)(6), (e), and (f); 42 C.F.R. § 93.403(c); 42 C.F.R. § 93.412; 42 C.F.R. § 93.413. *See Anversa*, 835 F.3d at 172 (observing, "although ORI examines the institution's handiwork in determining whether to carry out its own investigation * * * there is no formal process for a respondent to prefer charges that an institution has violated the regulations in the course of either the inquiry or the first-tier investigation" and "it is manifest that neither the statute nor the regulations contemplate enforcement by private parties" explaining "[i]nstead, enforcement is left to * * * ORI.").

{¶ 45} Specifically, ORI may review an institution's "findings and process" for responding to allegations of research misconduct and its "institutional assurances." 42 C.F.R. § 93.400(a)(6) and (e). In conducting its review of research misconduct proceedings, ORI may "[d]etermine if the institution conducted the proceedings in a timely and fair manner in accordance with this part with sufficient thoroughness, objectivity, and competence to support the conclusions." 42 C.F.R. § 93.403(c). *See also* 42 C.F.R. § 93.300(g) (obligating institutions to cooperate with HHS during any research misconduct proceeding or compliance review). In making decisions on institutional noncompliance,

"ORI may decide that an institution is not compliant with this part if the institution shows a disregard for, or inability or unwillingness to implement and follow the requirements of [the Regulation] and its assurance" considering factors that include, among others, the institution's failure to establish and comply with policies and procedures under the Regulation, failure to respond appropriately to research misconduct allegations, failure to report to or cooperate with ORI, and "[o]ther actions or omissions that have a material, adverse effect on reporting and responding to allegations of research misconduct."  42 C.F.R. § 93.412(b).

{¶ 46} Following its review of institutional compliance with its policies and procedures, including an institution's participation in research misconduct proceedings, ORI has the authority to "make findings and impose HHS administrative actions."  42 C.F.R. § 93.400(f).  *See also* 42 C.F.R. § 93.300(h) (obligating institutions to assist and enforce any administration action imposed by HHS on its institutional members).  The institution's failure to comply with its assurances and the requirements of the Regulations "may result in enforcement action against the institution." 42 C.F.R. § 93.413(a).  ORI may also "address institutional deficiencies through technical assistance if the deficiencies do not substantially affect compliance," issue a letter of reprimand, direct that research misconduct proceedings be handled by HHS, place the institution on special review status, place information on the institutional noncompliance on the ORI website, require the institution to take corrective actions, require the institution to adopt and implement an institutional integrity agreement, recommend that HHS debar or suspend the entity, or take "[a]ny other action appropriate to the circumstances."  42 C.F.R. § 93.413(c).

{¶ 47} ORI's authority to review an institution's investigation into research misconduct allegations is not unlimited, but expressly tied to those situations arising from federally mandated policies and procedures connected to institution's receipt of federal funding to support biomedical or behavioral research.  *See* 42 U.S.C. § 289b(a), (c), (d); 42 C.F.R. § 93.100, 102.  The Regulations specifically permit institutions to have internal standard of conduct that differ from the federal standards for research misconduct and to find that separate conduct actionable outside of the federal scheme.  In this regard, 42 C.F.R. § 93.319 states:

> (a) Institutions may have internal standards of conduct
> different from the HHS standards for research misconduct

under this part. Therefore, an institution may find conduct to be actionable under its standards even if the action does not meet this part's definition of research misconduct.

(b) An HHS finding or settlement does not affect institutional findings or administrative actions based on an institution's internal standards of conduct.

42 C.F.R. § 93.319(a) and (b). *See also* 42 C.F.R. § 93.102(d) ("This part does not prohibit or otherwise limit how institutions handle allegations of misconduct that do not fall within this part's definition of research misconduct or that do not involve [federal] support.").

{¶ 48} In this case, appellant cites to 42 C.F.R. § 93.319 and the shared responsibility provision of 42 C.F.R. § 93.100 in arguing the federal scheme does not shield the state from their own "internal standards of conduct" or occupy the field analogous to the bankruptcy code at issue in *PNH*. (Appellant's Brief at 13.) Appellant contends that, given a presumption exists against applying federal preemption, the trial court should have denied appellee's motion since the contractual relationship between the parties is not impeded by federal law.

{¶ 49} While appellant's assertion that the federal scheme permits institutions to establish and enforce their own "internal standards of conduct" is true generally, the claims in this case found by the trial court to be federally preempted—those based on allegations of conflicts of interest and a prolonged investigation—do not arise from appellee's "different" internal standards of conduct. 42 C.F.R. § 93.319(a).

{¶ 50} Instead, the research misconduct allegations found to be preempted in this case undisputedly arise out of biomedical and behavioral research supported by federal funds, which invokes federal law and an extensive regulatory framework that governs appellee's actions in responding to allegations of research misconduct. The federal scheme specifically incorporates standards for conflicts of interest and the length of the investigation. Moreover, in protecting the integrity of its distribution of federal funds to support biomedical and behavioral research, Congress empowered ORI, exclusively, to police and punish institutional noncompliance with the federal research misconduct scheme. In doing so, Congress has "manifested its intent" to preempt state law claims challenging institutional compliance with research misconduct policies and procedures during its investigation. *PNH* at ¶ 19. This interpretation, which essentially places

authority over institutional compliance with ORI instead of state courts, furthers the policy and purpose of the federal government to protect the health and safety of the public, to promote the integrity of research, and to conserve public funds. 42 C.F.R § 93.107. To do otherwise would risk imposing litigation risks on institutions that could not only vary state-to-state, but interfere with and discourage biomedical and behavioral research supported by federal funds.

{¶ 51} Having reviewed the pertinent federal law and regulations as it applies to the allegations in appellant's complaint, we conclude that appellant's attempt to challenge appellee's compliance with federally mandated policies and procedures by bringing breach of contract claims under Ohio law, at minimum, poses "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in enacting the Public Health Services Act. *Volkswagen* at ¶ 14. As a result, the trial court did not err in determining appellant's breach of contract claims premised on appellee violating federally mandated policies and procedures, including his challenges to the timeliness and fairness of the proceedings, are preempted and, consequently, dismissing those claims under Civ.R. 12(C).

{¶ 52} Appellant's first assignment of error is overruled.

### B. Second Assignment of Error

{¶ 53} Appellant's second assignment of error asserts the trial court erred as a matter of law by dismissing under Civ.R. 12(C) his common law breach of contract claims after "misapplying the discretion doctrine." (Appellant's Brief at 17.) We agree with appellant.

{¶ 54} Initially, we note that appellant's second assignment of error is not rendered moot by our resolution of the first assignment of error to the extent he alleges breach of contract claims arising from appellee's internal policies and procedures for research misconduct distinct from those mandated by the federal scheme and, therefore, outside of ORI's purview of institutional oversight. *See* 42 C.F.R. § 93.319(a) and (b); 42 C.F.R. § 93.102(d). The trial court apparently determined the same, noting that appellee is authorized under 42 C.F.R. § 93.319 to act under its own internal standards of conduct, which may differ from the federal standard for research misconduct. The trial court resolved appellant's contentions as to appellee failing to follow its self-imposed duty to rehabilitate appellant's reputation and as to removing appellant as the Wolfe Chair and

taking other non-disciplinary actions under general contract law principles and ultimately determined those claims should be dismissed.

{¶ 55} In challenging that result, appellant does not dispute that a breach of contact claim fails, as a matter of law, when the allegations of the complaint only establish the defendant acted within contractually conferred discretion. *See Lucarell v. Nationwide Mut. Ins. Co.*, 152 Ohio St.3d 453, 2018-Ohio-15, ¶ 5, 41 (emphasis added) (stating "[a] cause of action for breach of contract requires the claimant to establish the existence of a contract, the failure without legal excuse of the other party to perform *when performance is due*, and damages or loss resulting from the breach" and, concerning the implied duty of good faith and fair dealing in contract performance and enforcement, that "[a] party to a contract does not breach the implied duty of good faith and fair dealing by seeking to enforce the agreement as written.").

{¶ 56} Instead, appellant first contends the trial court misapplied the applicable contract provision, Section K. Rehabilitation, contained within the *University Policy and Procedures Concerning Research Misconduct*.[3]  Section K states:

> <u>K. Rehabilitation.</u> In any case in which a Respondent is found not to have committed research misconduct, any reference to the case shall be removed from the files of the University including the personnel file of the Respondent, except that an official file shall be kept by either the Executive Vice President for Academic Affairs and Provost or by the Vice President for Research, as provided for in E above. The Vice President for Research or Coordinator shall be responsible for exercising reasonable efforts to accomplish such removal. ***The University shall also work with the Respondent to rectify any injury done to the reputation of Respondent, including, with the permission of Respondent, release of a press announcement of the results of the investigation. The steps to be taken to accomplish rehabilitation of the Respondent, including any requested economic rehabilitation, shall be at the discretion of the Vice President for Research.***

(Emphasis sic.)  (Compl. at ¶ 28, Ex. 2.)

---

[3] Appellee did not raise any issue concerning appellant meeting procedural requirements for asserting his breach of contract claims, such as those related to attachments to pleadings pursuant to Civ.R. 10(D)(1).

{¶ 57} The trial court, citing Section K, determined that, "[e]ven making all reasonable inferences in [appellant]'s favor, the actions that [appellee] took at the conclusion of the investigation were at its discretion." (Decision at 13.) We disagree with this conclusion.

{¶ 58} While institutions have discretion as to if and how they choose to rehabilitate any injury to a respondent's reputation, appellee, through Section K, chose to assume a mandatory duty to work with appellant in these circumstances to rehabilitate his reputation. *See* 42 C.F.R. § 93.304(k) (providing, in part, that institutional policies and procedures concerning institutional efforts to protect or restore the reputation of a respondent who has not committed research misconduct are "as appropriate"). Under Section K, since appellant was undisputedly "found not to have committed research misconduct," appellee, by its own policy, was mandated to "work with" appellant to "rectify any injury done to [his] reputation." (Compl. at ¶ 28, Ex. 2.)

{¶ 59} The allegations in appellant's complaint, construed as true under Civ.R. 12(C), established that appellee had not responded to his request for remediation or worked with him to rectify any injury to his reputation following the College of Medicine Investigation Committee's determination that the allegations against him did not support a finding of research misconduct. The discretion afforded to appellee in selecting "*the steps to be taken* to accomplish [appellant's] rehabilitation, including any requested economic rehabilitation," is secondary to appellee's initial contractual obligation to work with appellant to rectify any injury to his reputation. (Emphasis added.) (Compl. at ¶ 28, Ex. 2.)

{¶ 60} Having construed as true, and in favor of the appellant, the material allegations in the complaint and all reasonable inferences to be drawn from those allegations, it does not appear beyond doubt that appellant can prove no set of facts that would entitle him to relief on his claim that appellee breached Section K of the *University Policy and Procedures Concerning Research Misconduct*. Therefore, we find the trial court erred in this regard and dismissal of that claim is not appropriate under Civ.R. 12(C). *Maternal Grandmother* at ¶ 10-13.

{¶ 61} Appellant's contentions regarding appellee's non-disciplinary actions likewise should not have been dismissed under Civ.R. 12(C), but for a different reason. The

complaint and attachments establish that the non-disciplinary administrative actions appellee took against appellant were "[s]eparate and apart from the research misconduct allegations" and based on the College of Medicine Investigation Committee's finding of "improprieties" not rising to the level of research misconduct. (Ex. 1, Sept. 2, 2021 Dr. Bradford Letter at 2.)  Those non-disciplinary administrative actions were undertaken "pursuant to [Dr. Bradford's] oversight authority as Dean." (Ex. 1, Sept. 2, 2021 Dr. Bradford Letter at 2.)  In other words, appellee's non-disciplinary actions taken within its administrative authority do not trigger the rehabilitation provision of Section K, and that provision, therefore, does not control the legal analysis.

{¶ 62} However, appellant did not base his contract claim in this regard solely on appellee's duty to rehabilitate his reputation under Section K or any purported flaws in the research misconduct process preempted by federal law.  He alleged, in pertinent part, that appellee "failed to act in accordance with [appellee's] Faculty Rules" in taking the non-disciplinary actions and that, as a result, he is entitled to damages among other remedies. (Compl. at ¶ 51, 54.)  While appellant does not specify what faculty rule appellee failed to comply with, appellee does not dispute that appellant had a contract with appellee and that the rules and regulations concerning academic procedures were incorporated into that contract. *See Saha v. Ohio State Univ.*, 10th Dist. No. 10AP-1139, 2011-Ohio-3824, ¶ 25. As previously noted, appellee has not raised any issue concerning appellant meeting procedural requirements, such as those under Civ.R. 10(D)(1), for asserting his claims.

{¶ 63} Under the Civ.R. 12(C) standard, having construed as true, and in favor of the appellant, the material allegations in the complaint and all reasonable inferences to be drawn from those allegations, it does not appear beyond doubt that appellant can prove no set of facts that would entitle him to relief on his claim that appellee breached faculty rules before imposing non-disciplinary administrative actions distinct from research misconduct allegations.  Therefore, we find the trial court additionally erred in this regard and dismissal of that claim is not appropriate at this juncture. *Maternal Grandmother* at ¶ 10-13.

{¶ 64} Accordingly, appellant's second assignment of error is sustained.

**C. Third Assignment of Error**

{¶ 65} With his third assignment of error, appellant contends that, under Civ.R. 12(C), a trial court errs as a matter of law by dismissing a common law breach of contract

claim for lost income when it "misapplies the expectancy measure of damages." (Appellant's Brief at 21.) This issue is not ripe for appellate review.

{¶ 66} We sustained appellant's second assignment of error concerning his breach of contract claims against appellee that arise from appellee's internal policies and procedures for research misconduct distinct from those mandated by the federal scheme. That issue will be remanded to the trial court for determination on the merits and, if warranted, consideration of appellant's argument on damages such as lost consulting income. We decline to address appellant's challenge to the trial court's application of expectancy measure of damages since a determination on that matter would be premature. *See Brookwood Presbyterian Church v. Ohio Dept. of Edn.*, 10th Dist. No. 12AP-487, 2013-Ohio-3260, ¶ 10 ("It has become settled judicial responsibility for courts to refrain from giving opinions on abstract propositions and to avoid the imposition by judgment of premature declarations or advice upon potential controversies.").

{¶ 67} Accordingly, appellant's third assignment of error is overruled as moot. *See State v. Gideon*, 165 Ohio St.3d 156, 2020-Ohio-6961, ¶ 26 ("[A]n assignment of error is moot when an appellant presents issues that are no longer live as a result of some other decision rendered by the appellate court."); App.R. 12(A)(1)(c) (stating an appellate court must decide each assignment of error "[u]nless an assignment of error is made moot by ruling on another assignment of error.").

### D. Fourth Assignment of Error

{¶ 68} In his fourth assignment of error, appellant argues that under Civ.R. 12(C), a trial court abuses its discretion and errs as a matter of law by dismissing a complementary declaratory judgment action where a breach of contract is also alleged. We agree with appellant that the declaratory action should not be dismissed in this case.

{¶ 69} R.C. 2743.03(A)(2) states in pertinent part that if the claimant in a civil action against the state "also files a claim for a declaratory judgment, injunctive relief, or other equitable relief against the state that arises out of the same circumstances that gave rise to the civil action * * *, the court of claims has exclusive, original jurisdiction to hear and determine that claim in that civil action." Unlike the trial court decision, we have determined that appellant asserted, sufficiently to survive Civ.R. 12(C), breach of contract claims against appellee arising from appellee's internal policies and procedures. Because

these breach of contract claims survive, the court of claims has jurisdiction to consider appellant's complementary requests for declaratory judgment that arise out of the same circumstances that gave rise to his remaining breach of contract claims.

{¶ 70} The basis for the trial court's dismissal of appellant's request for declaratory judgment—the failure of the breach of contract claims—is no longer valid. Consequently, its determination to dismiss appellant's request for declaratory judgment pursuant to Civ.R. 12(C) was in error. Accordingly, appellant's fourth assignment of error is sustained.

## IV. CONCLUSION

{¶ 71} Having overruled appellant's first and third assignments of error, and sustained appellant's second and fourth assignments of error, we affirm in part and reverse in part the judgment of the Court of Claims of Ohio. The matter is remanded to that court to proceed consistent with this decision. On remand, nothing in this decision should be construed as passing judgment on the merits of appellant's case. *Maternal Grandmother* at ¶ 16.

*Judgment reversed;*
*cause remanded.*

MENTEL, P.J. and JAMISON, J., concur.

_____