[Cite as *In re A.M.*, 2025-Ohio-4435.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In the Matter of: | : | |
| A.M., | : | No. 23AP-540 |
| | | (C.P.C. No. 23JU-4538) |
| (T.G., | : | |
| | : | (REGULAR CALENDAR) |
| | : | |
| Appellant). | : | |

D E C I S I O N

Rendered on September 23, 2025

**On brief:** *Mitchell A. Williams*, Public Defender, and *Leon J. Sinoff*, for appellant T.G. **Argued:** *Leon J. Sinoff.*

**On brief:** *Robert J. McClaren*, for appellee Franklin County Children Services. **Argued:** *Robert J. McClaren.*

**On brief:** *Jefferson E. Liston*, for appellees J.S. and B.S. **Argued:** *Jefferson E. Liston.*

**On brief:** *William T. Cramer*, for appellee M.C.

APPEAL from the Franklin County Court of Common Pleas,
Division of Domestic Relations, Juvenile Branch

BEATTY BLUNT, J.

{¶ 1} Appellant, T.G., appeals from the July 21, 2023 decision and judgment entry from the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, finding that A.M. is a dependent child and the August 3, 2023 decision and judgment entry from the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, terminating the parental rights of appellant[1] and granting

---

[1] The parental rights of A.M.'s biological mother were also terminated; however, A.M.'s biological mother is not appealing the trial court's judgments.

permanent custody of A.M. to Franklin County Children Services ("FCCS"). For the following reasons, we reverse.

## I.  Facts and Procedural History

### A.  Introduction

{¶ 2}   Appellant, T.G. (hereinafter "appellant" or "Father"), is the biological father of A.M., who was born on November 5, 2017.  Father is a long-term resident of Toledo, Ohio in Lucas County.  At the time of her birth, Father was not aware of A.M.'s existence.  Father became aware of A.M.'s existence in November, 2019, two years after A.M. was born, when he was contacted by FCCS as being a potential biological father of A.M.

{¶ 3}   Father and A.M.'s biological Mother, M.C. had known each other for about 20 years, when M.C. had been seeing Father's best friend at the time.  They were friends but were never a couple.  Although M.C. lived in Columbus, she and Father were in contact as Facebook friends and M.C. would occasionally contact Father via Facebook.  At some point M.C. contacted him on Facebook to tell him she would be visiting family in Toledo.  Father told her if she came to Toledo, she should contact him.  In 2017, M.C. went to Toledo, she contacted Father, and the two had a brief sexual relationship.

{¶ 4}   Shortly thereafter, M.C. returned to Columbus.  Father was not able to call M.C. on the phone because her phone number kept changing.  M.C. had Father's phone number, and although M.C. still occasionally contacted Father, she never told him she was pregnant, and he did not know she had had a baby.

### B.  A.M.'s Birth and Agency Involvement

{¶ 5}   When A.M. was born, M.C. was in Maryhaven, an alcohol and drug treatment provider in Franklin County, Ohio.  M.C. has been troubled by substance abuse and mental health issues a good portion of her adult life.  Prior to giving birth to A.M., M.C. had given birth to five other children.  Two of those children were eventually placed in the legal custody of a relative in Lucas County, Ohio as a result of an abuse, neglect, and dependency case.  Another child was placed in the legal custody of another individual as a result of a case filed in Franklin County, Ohio.  The last two of the five children (two sisters) were placed in the permanent custody of FCCS after having been found to be dependent children in another case filed in Franklin County, Ohio.

{¶ 6}    FCCS has been involved with M.C. and her children since 2012. In A.M's case, M.C. agreed to voluntary involvement under a managed-care contract, so initially no court orders were filed. However, M.C. left Maryhaven with A.M. and moved to Toledo, Ohio, where FCCS lost contact with her. This led to FCCS filing its first complaint alleging A.M. to be a neglected and/or dependent child on May 30, 2018. This resulted in a temporary order of protective supervision that became a temporary order of custody ("TOC") on July 18, 2018, when A.M. was eight months old.

## C. Establishment of Appellant's Paternity

{¶ 7}    At the time of A.M.'s birth, M.C. was married to R.M. and his name appeared on A.M.'s birth certificate. However, R.M. had been incarcerated in the state penal system since several years before A.M. was born. Therefore, it was implausible at best that R.M. was A.M.'s biological father.

{¶ 8}    At some point prior to November 16, 2018, M.C. disclosed to FCCS that "A. McAilster," also known as A. McAllister, and "T. Gaspen,"[2] now known as T. Gaston, were possible biological fathers of A.M. It is not clear from the record whether M.C. provided the wrong name of Father or whether the caseworker misunderstood the information. Father was eventually located, and in November, 2019—an entire year after M.C. first disclosed Father might be A.M.'s biological father—Father was contacted by FCCS regarding his possible paternity of A.M. and asked to submit a DNA sample.

{¶ 9}    On December 26, 2019, Father provided a blood sample for a DNA test to the Lucas County Child Support Enforcement Agency ("LCCSEA"). For unexplained reasons, Father's DNA sample was not located to be tested for comparisons to A.M.'s DNA until May, 2021. During the almost year and a half delay between providing his sample for DNA testing and the sample having been tested and matched to A.M., Father estimated that he spoke to LCCSEA twice and to FCCS on four or five occasions. It is unclear when or how the DNA sample confirmation from LCCSEA was received by the Franklin County Child Support Enforcement Agency ("FCCSEA"), but the results confirmed that Father was A.M.'s biological father. Based upon the genetic test results provided by FCCSEA, the trial court ultimately declared Father to be the biological father of A.M.

---

[2] The record and the parties' briefs contain various misspellings of Father's last name as "Gaspen" and "Gapsen."

### D. Father's Visitations with A.M.

{¶ 10} After the DNA results confirmed Father's paternity, he began driving two and a half hours from Toledo to Columbus for weekly visits with A.M. at FCCS. Unfortunately, these initial visits were very stressful for A.M. due to A.M.'s health and emotional challenges. Indeed, A.M. has been diagnosed with trauma response disorder, sensory disorder, and emotional regulation disorder, all of which cause A.M. to have high anxiety and stress, particularly in unfamiliar situations with unfamiliar people. Notably, during the timeframe of Father's visitations with A.M., A.M. was neither told nor was she otherwise aware that Father was her biological father. Because the visits between Father and A.M. were so difficult for A.M., in October, 2021 the trial court ordered that future visits take place only in a supervised therapeutic setting.

{¶ 11} Between October 2021 and June 2022, visits between Father and A.M. were not authorized because FCCS did not procure a therapist who could provide the supervised therapeutic visits until May 2022. Indeed, the therapeutic visits were only resumed after counsel for Father orally moved for enforcement of the trial court's order for therapeutic visits at a hearing for what was originally scheduled to be a trial on FCCS' most recently refiled complaint. The presiding magistrate agreed with counsel for Father that the delay was unreasonable and ordered "that the Agency is to have the child set up for visitation in a therapeutic setting." (May 23, 2022 Tr. at 12.)

{¶ 12} Shortly thereafter, Kelley Beckett was engaged for therapeutic services. In May 2022, Ms. Beckett met with A.M. by herself. The first therapeutic visitation session with Father, A.M. and Ms. Beckett took place on June 23, 2022. Therapeutic visitation, supervised by Ms. Beckett, continued until the resolution of FCCS' request for permanent custody in August 2023.

### E. Legal Proceedings

{¶ 13} As noted above, on May 30, 2018, FCCS filed its first complaint alleging A.M. to be a neglected and dependent child. Subsequently, the complaint was dismissed and refiled 17 times.[3]

---

[3] These cases are as follows: 18JU-9889, 18JU-13415, 19JU-1792, 20JU-372, 20JU-6187, 20JU-8578, 21JU-1350, 21JU-4206, 21JU-7026, 21JU-9650, 21JU-12620, 22JU-2790, 22JU-5969, 22JU-8888, 22JU-11725, 23JU-1184, and 23JU-4538, which was the final complaint filed.

{¶ 14} On February 23, 2022, the then-current refiled complaint proceeded to a trial at which Father provided testimony. Subsequently, for reasons not entirely clear from the record, that trial was recessed and then never resumed. At a court date on March 18, 2022, the magistrate noted that "discovery issues" had arisen during trial and stated that discovery had still not been exchanged. (Mar. 18, 2022 Tr. at 2.)

{¶ 15} On August 22, 2022, a second attempt at conducting trial on the most current iteration of the refiled complaint began. Several witnesses provided testimony, including Father. This second trial was eventually recessed until November 7, 2022; however, testimony did not resume on that day. Instead, a request by a family member of M.C. to be added as a party raised concerns with whether M.C. had been properly served.

{¶ 16} Subsequently, the magistrate found that M.C. had not been properly served, and trial could not proceed. Further, the magistrate concluded that because she had already heard testimony from witnesses prior to the introduction of the new party, she must recuse herself from the case entirely. Ultimately, over the objections of counsel for T.G., the case was transferred to a visiting judge.

{¶ 17} Meanwhile, after the second aborted trial, but prior to the hearing upon the final refiled complaint, A.M.'s foster parents, J.S. and B.S., moved to intervene as parties in the case. Over the objections of counsel for both T.G. and M.C., the trial court granted party status to the foster parents for dispositional purposes only.

### F. Adjudication Hearing

{¶ 18} On May 1, 2023, FCCS filed the final refiled complaint under case 23JU-4538 and set forth three counts. The first count alleged A.M. to be a neglected child pursuant to R.C. 2151.03(A)(2); the second count alleged A.M. to be a dependent child pursuant to R.C. 2151.04(C); and the third count alleged A.M. to be a dependent child pursuant to R.C. 2151.04(D)(1)(2).

{¶ 19} Beginning on June 29, 2023—more than five years after FCCS had filed its first complaint—the trial court commenced an adjudication hearing pursuant to Juv.R. 2(B) to determine whether A.M. was a neglected, dependent or abused child as alleged in the complaint. The trial court began by observing that T.G.'s DNA test results demonstrated that he was A.M.'s biological father and formally declared him as such. Additionally, M.C.'s husband and nominal father of A.M., R.M., appeared by video from the prison where he

was incarcerated and disclaimed any involvement in the matter, whereupon he was released as a party to no objections.

{¶ 20} The adjudication hearing continued over the course of several days, at which three witnesses provided testimony: Kelley Beckett, A.M.'s counselor, Father, and Lisa Blackford the caseworker. The following evidence was adduced at the adjudication hearing.

{¶ 21} Kelley Beckett was the first witness to testify. Ms. Beckett is a counselor who had supervised therapeutic visitation between A.M. and Father and conducted therapy with A.M. Ms. Beckett had initially been consulted to oversee A.M.'s therapeutic visitation with Father, but in August 2022, she began conducting individual therapy with A.M. as well.

{¶ 22} Ms. Beckett testified that A.M. habitually displays extreme emotional reactions she described as "bratty" that exceed what is to be expected from a five-year old child. (June 29, 2023 Tr. at 51-52.) A.M. screams, cries, kicks, throws her body, sometimes breaks furniture, and has hit her foster mom. A.M. "does not like having appointments" and, for a long time, would have "big, explosive melt-downs" because of Ms. Beckett's presence. *Id*. at 54. Ms. Beckett testified that even for a trained professional like herself, it took "a very, very long time" for A.M. to establish some trust with her and answer her questions verbally instead of throwing tantrums. *Id*. at 78.

{¶ 23} Ms. Beckett testified that in her observations of Father's visits with A.M., he "is very kind to her" and she had no concerns about Father's kindness toward A.M. (June 29, 2023 Tr. at 70.) She further testified that Father "is very careful not to push [A.M.] in a way that will make her uncomfortable," even if it might prove to be to the detriment of his legal position as to custody. *Id*. at 60. At the visits, Father will paint A.M.'s fingernails, draw, and make art projects. Father is very helpful in managing A.M.'s concerns during the visits.

{¶ 24} Ms. Beckett stated that Father and A.M. "have fun together" and refers to him as "her friend." (June 29, 2023 Tr. at 70.) However, Ms. Beckett felt that they did not seem to be building a parental bond. Nevertheless, Ms. Beckett testified that Father was receptive to parenting advice and "always conducive [sic] to working with things I give him" as suggestions. *Id*. at 73.

{¶ 25} Ms. Beckett stated visits between Father and A.M. were scheduled weekly. Ms. Beckett testified that she did not feel that Father has been consistent with visits in the

way she would have liked him to be. However, Ms. Beckett also acknowledged that Father was travelling a long distance from Toledo for every visit.

{¶ 26} Continuing her discussion of the problems with consistency of visits that she identified, Ms. Beckett provided the example of the three-month period addressed by her most recent report. In this period, Father attended three visits. Father cancelled several visits due to a job change and several more due to car problems. Ms. Beckett noted, however, that two visits were cancelled on A.M.'s side due to A.M. attending art camp, and a third was cancelled when A.M. presented to the visit sick, with Father already en route from Toledo.

{¶ 27} Ms. Beckett testified that prior to this three-month period, she estimated that Father had missed eight or nine visits total. On cross-examination, however, Ms. Beckett agreed that many missed visits were not the fault of Father. For example, from November 2022 to early December 2022, a six-week block of weekly visits had been missed due to other parties' priorities and obligations, such as vacations and an unspecified death in the family.[4] In fact, Father had contacted Ms. Beckett in exactly this timeframe to re-engage with visits after some interruptions, and Ms. Beckett did not meet with him for another month and a half to begin that process.

{¶ 28} Finally, Ms. Beckett described frequently having conversations with Father wherein he repeatedly stated that he wanted custody of A.M. and felt he had done everything he had been ordered to do by the supervising agencies. During these conversations, Father would convey that nothing he had done had caused A.M. to be removed from his care.

{¶ 29} Father testified next. He is a longtime resident of Toledo, Ohio, where he owns a three-bedroom house. He testified that the house is his, but he does not have the deed, nor is the property in his name. According to Father, he bought the house from his cousin under a verbal contract. A.M. would have her own bedroom to stay in if she came to live with him.

{¶ 30} Father lives with his girlfriend and his girlfriend's sixteen-year-old daughter. Father also has custody of his seventeen-year-old nephew, whose mother had recently

---

[4] We observe that this six-week timeframe was part of the 90-day period that the juvenile court ultimately found "justif[ies] this court finding that Father had abandoned A.M." (Aug. 3, 2023 Jgmt. Entry at 7, ¶ 3).

passed away, and who was staying in a behavioral treatment program. He has four other children: three adult children in their twenties, and a thirteen-year-old child who lives with her mother and with whom Father has weekly visits.

{¶ 31} Father's employment background is in factory work, and he is also a self-employed barber. Father testified that his visitation obligations involving the weekly roundtrips from Toledo to Columbus, in addition to other court obligations, had resulted in him losing his first-shift job at Sterling Pipes and Tools. Nevertheless, he did recently obtain new full-time employment through a temporary agency named Sparks.

{¶ 32} Father had known M.C. for about 20 years. They were never in a romantic relationship, and he considered her a friend. They were not in consistent contact; rather, they were "Facebook friends" and she would contact him on Facebook "every blue moon." (July 5, 2023 Tr. at 34.) He knew of her having two other children, but he did not know their custodial status.

{¶ 33} Father testified that in November 2019, "the agency sent me a paper" telling him that he had been identified as a possible father of M.C.'s child. (July 5, 2023 Tr. at 33.) Prior to receiving this paperwork, he had no idea that M.C. was or had been pregnant. Upon learning this, Father testified that he "went right down" to the Toledo child support bureau to provide his DNA. (July 5, 2023 Tr. at 35.) He waited for news but did not hear anything, so he twice followed up with the Toledo child support authorities. Eventually he was told that Toledo did not know of him having a child in Columbus. In other words, Franklin County never obtained his DNA sample from the Lucas County child support authorities. Father then followed up with FCCS four or five times, conveying that his DNA was in Toledo for them to retrieve.

{¶ 34} Eventually, in May 2021, Father was told that he was A.M.'s father. Once the weekly visits were set up, he promptly started visits with A.M. Between June and October 2021, Father had about four visits at the agency with A.M. and he missed about four visits due to car issues. Father testified, however, that A.M. was struggling to adapt to "a new face in her life" which was causing her to have "issues in the visits." Because of the problems A.M. was having with the visits, Father was told they needed to be suspended until they could be in a therapeutic setting.

{¶ 35} Once the therapeutic visits finally began in about June of 2022, Father estimated he attended about nine of those visits. For each visit, Father drove the two-and one-half hours from Toledo. Father testified that A.M.'s foster family had cancelled two visits because A.M. was ill and because she was at camp, and Father had cancelled two visits when he had pneumonia and due to changes in employment. Father testified that since he had been having therapeutic visits with A.M., she seemed to be getting closer to him and even told him she loved him at the end of visits. If she comes in upset at the start of a visit, he works with her and gets her calmed down before the visit is over.

{¶ 36} As for A.M.'s relationship to her mother, Father explained that, if he received custody, he would consider A.M. to be at risk of great harm if M.C. was using drugs. Father believed that M.C. was currently in a drug treatment program and was sober but acknowledged he knew very little as to the specifics of her drug use. He would require that M.C. demonstrate through treatment paperwork, and otherwise, that she has her life in order before granting M.C. any opportunity to visit or come around A.M.

{¶ 37} Father testified that he completed an alcohol and drug assessment in connection with the court's temporary orders of custody. There were no recommendations from that assessment for him. Father readily admitted that he sometimes smokes marijuana. He generally smokes marijuana when he is in periods of high stress. Father stated that at the point of his testimony, he had used marijuana twice in the last four weeks. He only uses it on his porch outside his home, and not when anyone else is at home. He has completed about eight drug screens in total.

{¶ 38} Finally, Father testified that he wants to raise A.M. He further testified he did not intend to simply "snatch her out of [the foster parents'] life when I know I'm gonna need them to help me raise her before she can get comfortable with me knowing that I'm her father." (July 5, 2023 Tr. at 56.)

{¶ 39} The next witness to testify was Lisa Blackford. Ms. Blackford was the assigned caseworker for A.M. beginning in April 2022. Ms. Blackford testified that she visited Father's residence in Toledo in August of 2022. Ms. Blackford testified that she had no concerns regarding the residence. She stated that the house had undergone remodeling, that it was largely completed, and the house met minimum standards as proposed by FCCS. The utilities were on, and although the home was sparsely furnished, she acknowledged the

home was still being moved into. Ms. Blackford reiterated that she did not have concerns regarding the home.

{¶ 40} On July 20, 2023, at the conclusion of the adjudication hearing, the trial court pronounced on the record that it found clear and convincing evidence that A.M. was neglected as to M.C., but not as to Father. The trial court further pronounced that it found "by clear and convincing evidence, that [A.M.] is dependent," and "we need to go then to the dispositional phase." (July 20, 2023 Tr. at 13-14.)

{¶ 41} On July 21, 2023, the trial court issued a decision and judgment entry finding that A.M. was a dependent child and which provided, in most pertinent part:

> Based upon facts set forth above, the Court finds, by clear and convincing evidence, that AM is a dependent child. AM is clearly a neglected child as to her mother, but it is questionable as to whether AM is neglected as to her father. Even though [Father] did not even know about [M.C.] being pregnant, he cannot be held responsible for the child not being properly cared for by the mother. FCCS has alleged that AM is a dependent child under RC 2151.04(C) which states as follows: "Whose condition or environment is such as to warrant the state, in the interests of the child, in assuming the child's guardianship." Therefore, this determination must be made upon the child's condition, not on the parents' deficiencies. There is sufficient evidence which shows that returning AM to her mother or placing AM with her father would be detrimental to AM. Further, it is also clear to this Court that the condition of the child is such that it is in the best interests of the child that the state, having had temporary custody of this child for such a long period of time, should continue assuming the child's guardianship as has been done since the child was taken at eight months of age on July 18, 2018.

(July 21, 2023 Jgmt. Entry at 6.)

## G. Dispositional Hearing

{¶ 42} On July 27 and 28, 2023, the trial court proceeded to hold a dispositional hearing pursuant to Juv.R. 2(O) to determine whether permanent court custody of A.M. was warranted. At the hearing, testimony was provided by previously appearing witnesses, including Father and Ms. Blackford. In addition, testimony was provided by the foster parents, J.S. and B.S., and A.M.'s Guardian ad Litem ("GAL") Janie Roberts. We need not

belabor the specifics of the testimony presented at the dispositional hearing because, as explained below, it is not relevant to our resolution of this matter.[5]

{¶ 43} Thereafter, on August 3, 2023, the trial court issued a decision and judgment entry sustaining FCCS' motion for permanent custody and divesting both parents of their parental rights. (Aug. 3, 2023 Jgmt. Entry.)

{¶ 44} This timely appeal followed.

## II. Assignments of Error

{¶ 45} Father asserts the following assignments of error for our review:

[1.]     The Juvenile Court Lacked Jurisdiction to Proceed to Disposition of FCCS's Request for Permanent Custody When it Failed to Adjudicate Each and Every Count of the Complaint.

[2.]     The Trial Court Abused its Discretion and Violated [Father's] Constitutional Rights to Due Process When it Granted Full Party Status to Unrelated Foster Parents in a Proceeding to Terminate a Father's Parental Rights.

[3.]     The Trial Court Erred in Permanently Terminating [Father's] Parental Rights Because FCCS Failed To Exercise Reasonable and Diligent Efforts to Unify A.M. With [T.G.], Her Natural Father.

[4.]     The Permanent Termination of [Father's] Parental Rights Was Contrary to the Manifest Weight of the Evidence When [Father] Was Demonstrably a Suitable Person for Custody of His Child.

[5.]     There Was Insufficient Evidence to Support a Finding of Neglect or Dependence on the Date of the Complaint, a Necessary Prerequisite for Permanent Agency Custody.

## III. Discussion

{¶ 46} Because we find it dispositive of this appeal, we begin by addressing Father's fifth assignment error. In his fifth assignment of error, Father asserts there was insufficient evidence to support a finding of neglect or dependence on the date of the complaint, a necessary prerequisite for awarding permanent agency custody. As discussed below, we agree.

---

[5] Suffice it to say that all of the testimony presented pertained to issues going to the best interest analysis.

{¶ 47} We begin by observing it is well-settled that "[p]arents have a constitutionally-protected fundamental interest in the care, custody, and management of their children." *In re H.D.*, 2014-Ohio-228, ¶ 10 (10th Dist.), citing *Troxel v. Granville*, 530 U.S. 57, 65 (2000). The Supreme Court of Ohio has recognized the essential and basic right of a parent to raise his or her child. *In re Murray*, 52 Ohio St.3d 155, 157 (1990); *In re C.F.*, 2007-Ohio-1104, ¶ 28. "Parental rights, however, are not absolute, and a parent's natural rights are always subject to the ultimate welfare of the child." *In re E.B.*, 2017-Ohio-2672, ¶ 19 (10th Dist.), citing *In re K.M.*, 2015-Ohio-4682, ¶ 15 (10th Dist.), and *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979). Thus, we recognize that in certain circumstances, the state may terminate the parental rights of natural parents when such termination is in the best interests of the child. *H.D.* at ¶ 10, citing *In re E.G.*, 2007-Ohio-3658, ¶ 8 (10th Dist.), citing *In re Harmon*, 2000 Ohio App. LEXIS 4550 (4th Dist. Sept. 25, 2000); *In re Wise*, 96 Ohio App.3d 619, 624 (9th Dist. 1994).

{¶ 48} The permanent termination of parental rights has been described as " 'the family law equivalent of the death penalty in a criminal case.' " *In re B.C.*, 2014-Ohio-4558, ¶ 19, quoting *In re Smith*, 77 Ohio App.3d 1, 16 (6th Dist. 1991). *See also In re Hoffman*, 2002-Ohio-5368, ¶ 14. Accordingly, a parent "must be given every procedural and substantive protection the law allows prior to parental rights being [permanently] terminated." (Citation omitted.) *In re J.Z.*, 2005-Ohio-3285, ¶ 9 (10th Dist.). *See also Santosky v. Kramer*, 455 U.S. 745, 753-754 (1982) ("When the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures."). With the foregoing general principles in mind, we turn to the case before us.

{¶ 49} In this case, Father's parental rights were terminated after the trial court adjudicated A.M. to be a dependent child as to both Mother and Father.[6] (*See* July 21, 2023 Jgmt. Entry (finding dependency); Aug. 3, 2023 Jgmt. Entry (granting permanent custody.)) As to Father, the trial court found A.M. to be dependent under R.C. 2151.04(C), which provides that a "dependent child" is a child "[w]hose condition or environment is such as to warrant the state, in the interests of the child, in assuming the child's guardianship." A finding of dependency under R.C. 2151.04(C) "focuses on whether the child is receiving proper care and support." *In re L.C.*, 2013-Ohio-2564, ¶ 20 (10th Dist.),

---

[6] The trial court also found A.M. to be a neglected child as to Mother only.

citing *In re Bibb*, 70 Ohio App.2d 117 (1st Dist. 1980). Therefore, a court must consider "the condition or environment of the child, not the fault of the parents." *Id.*, citing *In re Bishop*, 36 Ohio App.3d 123, 124 (5th Dist. 1987).

{¶ 50} However, a parent's conduct is relevant to the dependency determination insofar as such conduct forms part of the child's environment. *In re E.M.*, 2014-Ohio-1026, ¶ 34 (10th Dist.). "A parent's conduct is significant if it has an adverse impact on the child sufficient to warrant intervention." *In re L.H.*, 2019-Ohio-2383, ¶ 40 (12th Dist.), citing *In re T.B.*, 2015-Ohio-2580, ¶ 20 (12th Dist.). In order to adjudicate a child dependent pursuant to R.C. 2151.04(C), a court must "necessarily conclude that the parents' custody is detrimental to the child." *In re E.C.*, 2019-Ohio-3791, ¶ 32 (10th Dist.), citing *In re Trowbridge*, 2004-Ohio-2645, ¶ 14 (10th Dist.). Courts have emphasized that actual harm to the child is not necessary; circumstances giving rise to a legitimate risk of harm may suffice to support a dependency adjudication. *See, e.g.*, *In re L.L.*, 2023-Ohio-3032 (5th Dist.), *In re A.V.*, 2021-Ohio-3873 (12th Dist.), and *In re M.H.*, 2024-Ohio-1675 (9th Dist.). Importantly, dependency must be determined by the circumstances as they existed on the date of the filing of the complaint which is tried. R.C. 2151.23; *In re R.L.*, 2017-Ohio-4271 (9th Dist.); *In re K.G.*, 2023-Ohio-2198 (3d. Dist.). Thus, circumstances that may have existed before that point in time but no longer exist are of no legal relevance.

{¶ 51} R.C. 2151.35(A)(1) provides that "[i]f the court at the adjudicatory hearing finds from clear and convincing evidence that the child is an abused, neglected, or dependent child, the court shall proceed * * * to hold a dispositional hearing and hear the evidence as to the proper disposition to be made under [R.C.] 2151.353." *See In re L.C.* at ¶ 7; *In re N.P.*, 2008-Ohio-1727, ¶ 7 (10th Dist.). "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶ 52} Under R.C. 2151.35(A)(1), unless there is clear and convincing evidence of abuse, neglect, or dependency, no best-interests analysis should take place. A lack of a proper finding of dependency under R.C. 2151.04 precludes a trial court from proceeding

to a best interests analysis for determining whether permanent court custody is warranted. *See In Re Cunningham*, 59 Ohio St. 2d 100 (1979), syllabus ("Once a child has been found to be 'dependent' as defined in R.C. 2151.04, the 'best interests' of the child are the primary consideration in determining whether an award of permanent custody is justified pursuant to R.C. 2151.353(D)."). The dependency finding is a prerequisite to the dispositional phase, where the court evaluates the child's best interests under R.C. 2151.414. *See id.* "Consideration of dispositional interests, including the determination of a child's best interests, may not enter into the adjudicatory phase of the proceedings." Salvador, *Ohio Juvenile Law*, § 43.2 (2020 Edition) (citing *Cunningham*; further citations omitted.). Without a valid dependency adjudication, the court lacks the foundation to move forward with a custody determination. Juv.R. 2(B); *see also In re T.P.*, 2023-Ohio-3662, ¶ 9 (6th Dist.) ("The purpose of an adjudicatory hearing is 'to determine whether a child is * * * abused, neglected, or dependent or is otherwise within the jurisdiction of the court.' " citing Juv.R. 2(B). "If established, a dispositional hearing may then be held 'to determine what action shall be taken concerning a child who is within the jurisdiction of the court.' " citing Juv.R. 2(O).).

{¶ 53} In its July 21, 2023 journal entry finding that A.M. was a dependent child, the trial court's factual findings leading it to ultimately find that A.M. was "dependent" as to Father were set forth thus:

> [Father] resides on Lincoln Street in Toledo[,] Ohio. He testified that he owns that house, but that the title has not yet been transferred to him from his cousin, being the person who allegedly sold the house to [Father]. It appears that there is no paperwork supporting [Father's] claimed ownership of this real estate and home in Toledo. [Father] has never been married, but he has fathered five children, including AM. His three oldest children are adults ranging in age from 23 to 26 years of age. Although he has never been married, he claims a 20-year-old child of his former girlfriend to be a stepchild. He also has a 13-year-old child from a former relationship. He was recently granted custody of his 17-year-old nephew, who does not reside with him since the nephew is in a behavioral program and lives elsewhere. That custody was granted to [Father] by the Lucas County Juvenile Court. [Father] has been employed by temporary employment agency and recently lost a job placement due to work absences which [Father] claims had to do with this case. [Father] currently lives with his girlfriend, [R.W.], and her 16-year-old daughter. AM has had

no contact with anyone mentioned above in this paragraph, except for [Father]. It has only been in the recent past that [Father] has secured this living arrangement in the house on Lincoln Street since the house was much in need of repairs. Prior to moving into the Lincoln Street house, [Father] lived on E. Park St. in Toledo at an apartment while he was working on this house. [Father] lived for six years on E. Park Street. [Father] has worked as a self-employed barber, although he never completed barber school and does not have a license. [Father] has some health issues, being diabetic. [Father] indicated that he had known [M.C.] for 20 years or so, but that they had only been friends. [Father] completed an alcohol and drug assessment In August 2022, and it was determined that he had no problems with alcohol use or abuse. However, [Father] uses marijuana when he is stressed according to his own testimony, but only uses marijuana when alone and outside on his porch. [Father] does not have a medical marijuana card, but in his testimony, he suggested that he was trying to obtain one. It is important to note that marijuana is still illegal in the State of Ohio for recreational purposes. Further, under federal law, marijuana is a controlled substance. ***Placing AM with [Father] in the environment indicated above would clearly be detrimental to the child.***

(Emphasis added.) (July 21, 2023 Journal Entry (Finding of Dependency) at 4, ¶ 8.) The court reiterates later in its journal entry that "[t]here is sufficient evidence which shows that returning AM to her mother or placing AM with her father would be detrimental to AM" in support of its finding that A.M. is dependent pursuant to R.C. 2151.04(C). *Id.* at 6.

{¶ 54} Based on the foregoing, a fair summary of the court's basis for finding that, as to Father, A.M. is a dependent child consists of the following facts:

1) He may or may not actually own the house in which he lives;

2) He has never been married, but he has fathered five children (including A.M.);

3) His employment has been through a temporary employment agency, and he recently lost a job placement due to work absences caused by visitations and obligations connected to the court case;

4) He lives with his girlfriend and her 16-year-old daughter;

5) Before he lived in his current house he lived in an apartment;

6) He sometimes works as a barber, but he never went to barber school and isn't licensed;

7) He has diabetes;

8) He admits he occasionally uses marijuana when stressed, but only when he is alone and only outside on his porch.

Notably, although the trial court concludes its recitation of the evidence purporting to support a dependency finding by stating "[p]lacing AM with [T.G.] in the environment indicated above would clearly be detrimental to the child[,]" the trial court fails to explain *how* or *why* these circumstances would or could be detrimental to A.M., i.e., that the circumstances are such that they give "rise to a legitimate risk of harm" so as to support a dependency adjudication. *See, e.g.*, *In re L.L.*, 2023-Ohio-3032 (5th Dist.), *In re A.V.*, 2021-Ohio-3873 (12th Dist.), and *In re M.H.*, 2024-Ohio-1675 (9th Dist.).

{¶ 55} Nor do we find that the foregoing evidence clearly and convincingly shows circumstances giving rise to a legitimate risk of harm that is sufficient to support a dependency adjudication so as to warrant the state, in the interests of A.M., in assuming her guardianship. First, whether Father owns the home in which he lives or previously lived in an apartment is not relevant to whether the home is suitable for raising a child. Furthermore, Ms. Blackford testified that she had no concerns regarding Father's home and that it met minimum standards set by FCCS. Neither do we find the fact that Father lives with his significant other and her 16-year-old daughter in the home circumstance which poses a legitimate risk of harm to A.M.

{¶ 56} Next, Father's marital status has no bearing on whether he can properly raise his child. We reject the notion that being a single parent creates a legitimate risk of harm to any child, including A.M.

{¶ 57} Regarding Father's employment status, certainly the record shows his history of employment has some gaps and perhaps has not been entirely consistent in the past. However, as of the date of trial Father was gainfully employed full-time with a temporary agency. Furthermore, he testified that the reason he had lost his previous position with the temporary agency was due to him having to miss work for his weekly visitation trips from Toledo to Columbus. It would be patently unfair to fault Father for losing his position due to work absences created by his visitation obligations. In addition, we wholly disagree that

Father's failure to obtain a barber license has any bearing on whether Father is willing and able to support A.M. Thus, we do not find that Father's employment status as it existed at the time of the complaint and trial posed a legitimate risk of harm to A.M.

{¶ 58} Next, the trial court's concern with the fact that Father has diabetes is both perplexing and troubling. Diabetes is, unfortunately, a relatively common malady which is wholly manageable, and this court cannot conceive of a reason why the trial court pointed to this as evidence supporting a finding of dependency. As with the rest of the evidence upon which the trial court based its finding of dependency, the trial court did not explain how this medical condition could create a legitimate risk of harm to A.M. In any event, we do not find that it could create such a risk.

{¶ 59} Finally, regarding Father's occasional recreational use of marijuana, we acknowledge that at the time of the trial recreational use of marijuana was not legal in the state of Ohio. We further observe, however, that just a few months after the trial, on November 7, 2023, adult use of marijuana for recreational purposes was legalized in Ohio. *See* R.C. Ch. 3780. Most significantly, in light of the fact that Father completed an alcohol and drug assessment as mandated by FCCS and there were no concerns or treatment recommendations, we do not find that Father's occasional recreational use of marijuana evinces clear and convincing evidence of a legitimate risk of harm to A.M.

{¶ 60} In sum, we find the evidence upon which the trial court relied does not clearly and convincingly show that A.M. is a child "[w]hose condition or environment is such as to warrant the state, in the interests of the child, in assuming the child's guardianship," as required to make a finding of dependency under R.C. 2151.04(C).

{¶ 61} As for FCCS' continued insistence that Father abandoned his child pursuant to R.C. 5151.414(B)(1) because Father did not see A.M. from September 1, 2022, to December 15, 2022, a period of more than 90 days, we reject this argument. Instead, we find the presumption of abandonment premised on the statute is readily rebutted by the evidence presented. Regarding the period from September 2022 through most of October, 2022, we acknowledge the record is unclear as to why visits did not occur, and the court will not speculate as to the reasons for this.

{¶ 62} However, from at least late October 2022 going forward, the record clearly shows that Father took steps to resume visits but was precluded from seeing A.M. due to

reasons that were not his fault. Specifically, on October 26, 2022, Father contacted Ms. Beckett to resume visitations, asking "how do we re-engage[?]" (July 14, 2023 Tr. at 29). As noted previously, on cross-examination, Ms. Beckett agreed that for the time period of November 2022 to early December 2022, a six-week block of weekly visits had been missed due to other parties' priorities and obligations, such as vacations and an unspecified death in the family, and that these missed visits were not the fault of Father. Ms. Beckett further agreed that after Father contacted her in late October regarding resuming visitations, she did not meet with him for another month and a half to begin that process. Furthermore, Ms. Beckett testified that when Father finally was permitted a visit on December 15, 2022, the visit went "very well," and he brought A.M. Christmas gifts. (July 14, 2023 Tr. at 30.) The foregoing evidence readily and convincingly rebuts any presumption that Father had abandoned A.M.

{¶ 63} In short, the evidence presented with regard to Father did not constitute clear and convincing evidence that the child is a dependent child. He worked to support his family. There is no evidence suggesting he had a problematic criminal record. He had a suitable home for A.M., which FCCS conceded met the standards required and for which there were no concerns. He had painted her future bedroom and was awaiting her arrival. His children were waiting to be big brothers and sisters to her. No clear and convincing evidence existed of a dependent condition as of the filing of the May 1, 2023 complaint. Thus, insufficient evidence supported the adjudication of dependence, and we sustain Father's fifth assignment of error.

{¶ 64} Our resolution of Father's fifth assignment of error requires reversal of the trial court's judgments adjudicating A.M. as a neglected and/or dependent child and granting permanent custody of A.M. to FCCS. Accordingly, Father's first, second, third, and fourth assignments of error are moot, and we need not address them. *Croce v. Ohio State Univ. Bd. of Trustees*, 2024-Ohio-2138, ¶ 67 (10th Dist.), citing *State v. Gideon*, 2020-Ohio-5635, ¶ 26 ("an assignment of error is moot when an appellant presents issues that are no longer live as a result of some other decision rendered by an appellate court"), and App.R. 12(A)(1)(c) (an appellate court must decide each assignment of error "[u]nless an assignment of error is made moot by ruling on another assignment of error").

## IV. Disposition

{¶ 65} Based on all the foregoing, we sustain the fifth assignment of error presented by appellant T.G. and find moot the first, second, third, and fourth assignments of error. Accordingly, we reverse the judgments of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch adjudicating A.M. to be a neglected and/or dependent child and granting permanent custody of A.M. to FCCS.

*Judgment reversed.*

DORRIAN and BOGGS, JJ., concur.